**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 3 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

BARBARA JENENNE NELSON,

      Plaintiff-Appellee,

v.

JIM GERINGER, individually and in his
capacity as Governor of the State of Wyoming;
ED BOENISCH, in his official capacity as
Adjutant General of the Wyoming National
Guard; THE STATE OF WYOMING,

      Defendants-Appellants.

_____

NATIONAL GUARD ASSOCIATION OF THE
UNITED STATES,

      Amicus Curiae.

No. 00-8039

---

HOWARD ARTHUR DILLON, JR., also known
as Art Dillon,

      Plaintiff-Appellee,

v.

JIM GERINGER, in his official capacity as
Governor and Commander in Chief of the
Wyoming National Guard; STATE OF
WYOMING,

No. 00-8093

Defendants-Appellants.

_____

NATIONAL GUARD ASSOCIATION OF THE
UNITED STATES,

Amicus Curiae.

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 99-CV-132-D, 00-CV-162-D)**

Richard Rideout, Special Assistant Attorney General (Gay Woodhouse, Attorney General; John W. Renneisen, Deputy Attorney General, with him on the briefs in both cases; and Francisco L. Romero, Senior Assistant Attorney General, with him on the briefs in *Nelson* only), State of Wyoming, Cheyenne, Wyoming, for Defendants-Appellants.

Patrick E. Hacker (Gregory P. Hacker with him on the briefs) of Patrick E. Hacker, P.C., Cheyenne, Wyoming, for Plaintiffs-Appellees.

James J. Hughes, Jr. of Bricker & Eckler, LLP, Columbus, Ohio; and Bruce S. Asay of Associated Legal Group, LLC, Cheyenne, Wyoming, filed a brief in each case for Amicus Curiae.

Before **SEYMOUR** and **BRISCOE**, Circuit Judges, and **OWEN**,[*] District Judge.

**SEYMOUR**, Circuit Judge.

_____

[*]The Honorable Richard Owen, District Judge, United States District Court for the Southern District of New York, sitting by designation.

This opinion addresses the cases of two plaintiffs, Barbara Jenenne Nelson and Howard Arthur Dillon, who were dismissed from their positions as Assistant Adjutant Generals of the Wyoming National Guard. The underlying facts and claims brought by plaintiffs are substantially the same for both cases, so we consolidate them for purposes of appeal.

Each plaintiff brought suit in district court under 42 U.S.C. § 1983 after being removed from the position of Assistant Adjutant General of the Wyoming National Guard for failing to meet the state's newly enacted residency requirement for that position. The district court held that the residency requirement violated the Privileges and Immunities Clause, granted summary judgment for plaintiffs, and ordered them reinstated. The state of Wyoming appeals and we affirm.

I

There are two Assistant Adjutant General (AAG) positions in the Wyoming National Guard, one for the Wyoming Air National Guard and one for the Wyoming Army National Guard.[1] The AAGs are commanded by the Adjutant

_____

[1]In December 1995, pursuant to federal statute, *see* National Guard Regulations (NGR) 600-100 (11-3) (1994), the two AAGs were made the Commanders of their respective state Air and Army national guard units.

General, the highest ranking military officer in the state Guard, who in turn reports to the state governor. *See* WY. STAT. ANN. § 19-7-103 (LexisNexis 2001).

Ms. Nelson and Mr. Dillon are residents of Colorado. Ms. Nelson has been a member of the Wyoming Air National Guard since April 15, 1989. In early 1995, Ms. Nelson applied to be AAG of the Wyoming Air National Guard. A military selection board for the Wyoming National Guard chose her as the best-qualified applicant, and she assumed the office on May 1, 1995. At the time relevant to this suit, fifty-one percent of the members of the Wyoming Air National Guard were nonresidents of the state, and fifty percent of its officers were nonresidents. Aplt. App. (Nelson) at 41.

In the spring of 1997, the AAG position for Commander of the Wyoming Army National Guard became vacant and Mr. Dillon was selected for the position. He assumed the office on March 12, 1998. Mr. Dillon has served in the Wyoming National Guard since 1979, having been recruited from the Colorado National Guard to join. Aplt. App. (Dillon) at 47. Approximately twenty percent of Wyoming Army National Guard members are nonresidents. Aplt. App. (Nelson) at 41. In accordance with state and federal law, Ms. Nelson and Mr. Dillon were both promoted to the rank of Brigadier General. *See* National Guard Regulations (NGR) 600-100 (11-3); WY. STAT. ANN. § 19-7-104.

In spring 1998, the Wyoming legislature amended state law to require that, like the Adjutant General, the two AAGs must be state residents.[2] WY. STAT. ANN. § 19-7-104. The Act became effective on July 1, 1998.

In May 1998, Wyoming State Representative Mike Massey wrote to Wyoming Attorney General William U. Hill and requested an official opinion on whether the Wyoming Constitution imposed a residency requirement for AAGs in the Wyoming National Guard, stating he realized the statute "cannot be applied retroactively."[3] Aplt. App. (Nelson) at 85. The Attorney General rendered an opinion in response (Opinion No. 98-007), concluding that Article 6, section 15 of the Wyoming Constitution prevented non-residents from holding AAG positions. *Id.* at 80.

---

[2]The relevant statute provides that each assistant adjutant general "shall possess the qualifications set forth in W.S. 19-7-103(a)(i) through (iv)." WY. STAT. ANN. § 19-7-104. The referenced provision sets out the qualifications for Adjutant General, including the requirement that the Adjutant General "[b]e a resident of the state of Wyoming." *Id.* § 19-7-103(a)(iv). The other qualifications are at least ten years service as a field, staff or line officer in the United States army or air force, or national guard; at least four years service in the Wyoming National Guard immediately prior to the appointment; and the attainment of the federally recognized rank of lieutenant colonel. *Id.* § 19-7-103(a)(i) - (iii). There is no dispute that Ms. Nelson and Mr. Dillon met these other requirements.

[3]At the time relevant to this appeal, the Wyoming Constitution provided, "No person except a qualified elector shall be elected or appointed to any civil or military office in the state." WY. CONST. art. 6, § 15 (1998). This provision was amended in 1999 to provide that the only military offices to which the residency (qualified elector) requirement applies are Adjutant General and Assistant Adjutant General. WY. CONST. art. 6, § 15.

Following the issuance of the opinion, Ms. Nelson and Mr. Dillon were both removed from their AAG positions.[4]  Ms. Nelson was removed effective September 25, 1998.  Mr. Dillon was removed effective September 30, 1998.  During their respective tenures as AAGs, Ms. Nelson and Mr. Dillon received acceptable performance reviews; their non-residency was not a performance issue.  Since the removal of Ms. Nelson and Mr. Dillon, both AAG positions have been filled by state residents.

After she failed to obtain reconsideration of the Attorney General opinion from both the Attorney General and the Governor, Ms. Nelson brought suit under section 1983 against the state of Wyoming, the Governor, and Adjutant General Boenisch in his official capacity (collectively, the state).  She claimed her removal violated the Privileges and Immunities Clause, the Commerce Clause, and her constitutional rights to travel, equal protection, and due process.  She sought injunctive, declaratory, and monetary relief.  Mr. Dillon brought the same claims and sought the same relief in a suit challenging his removal.

----

[4]The district court indicated that Ms. Nelson and Mr. Dillon were removed pursuant to the new statutory residency requirement, although the court declared any similar provision of the Wyoming Constitution void as well.  Our review of the record indicates that Ms. Nelson and Mr. Dillon were actually removed pursuant to the Wyoming Constitution (and Attorney General Opinion No. 98-007 interpreting the state constitution).  *See* Aplt. App. at 80.  This does not affect the posture of this appeal as Ms. Nelson and Mr. Dillon challenged both the statutory and the state constitutional provisions below under the Declaratory Judgment Act, 28 U.S.C. § 2201.  We refer to both provisions as the residency requirement.

The district court granted summary judgment to Ms. Nelson and Mr. Dillon on Privileges and Immunities grounds and ordered their reinstatement without reaching the other constitutional claims presented.[5]  We affirm on Privileges and Immunities grounds and likewise do not address the other claims.

## II

## A

We review the grant of summary judgment de novo, applying the standard used by the district court.  *Wolf v. Prudential Ins. Co.*, 50 F.3d 793, 796 (10th Cir. 1995).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  In applying this standard, we view the evidence and inferences therefrom in the light most favorable to the non-moving party.  If there is no genuine issue of material fact in dispute, we determine whether the district court correctly applied the substantive

---

[5]Ms. Nelson initially sued the Governor in his personal and official capacities.  The district court held the Governor was entitled to qualified immunity and could be sued only in his official capacity.  The court therefore dismissed Ms. Nelson's claim for monetary damages.  Ms. Nelson does not appeal these issues.  Mr. Dillon sued the Governor only in his official capacity.

law. *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

**B**

Before turning to the Privileges and Immunities Clause, we first discuss the National Guard's dual role as a state and a federal entity in order to avoid significant detours into military structure and regulations at multiple points in our subsequent analysis. The discussion is based on our review of the record and relevant federal and state law, and therefore consists of undisputed fact or our legal conclusions.

The "Militia Clauses" of the United States Constitution provide:

> Congress shall have Power . . . To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.

U.S. CONST. art. I, § 8, cl. 15-16. The National Guard consists of the Air National Guard and the Army National Guard. 32 U.S.C. § 101(3). The National Guard was created by Congress pursuant to the Militia Clauses. *See id.* §§ 101(4), (6) (National Guard is "that part of the organized militia . . . that . . . has its officers appointed[] under the sixteenth clause of section 8, article 1, of the Constitution"); *see also id.* § 101(3).

-8-

For convenience, we will discuss only the Air National Guard (ANG), but the provisions we cite, or substantively identical provisions, also apply to the Army National Guard. *See*, *e.g.*, 10 U.S.C. §§ 10105-07 *et seq.* The ANG has a dual status: it constitutes both the state national guard units that comprise it, and the Air National Guard *of the United States*. 10 U.S.C. §§ 10111-13. In terms of their state aspects, the ANG units are the "state" units of the nation's organized militia. 32 U.S.C. § 101(6). States are responsible for appointing officers and training national guard members according to Congressional requirements. U.S. CONST. art. I, § 8, cl. 16; *see also* 32 U.S.C. § 501. The National Guard is available for states to use within their borders during peace time. 32 U.S.C. § 109(b). When the federally recognized ANG units are not in active federal service, they constitute the Air National Guard units of each of the several States and the United States territories. 10 U.S.C. § 10113.

Significantly, however, the Air National Guard remains a federal entity even when it is not in active federal service. The "federally recognized" state units of the ANG together constitute the Air National Guard of the United States, 32 U.S.C. § 101(7); 10 U.S.C. §§ 10112-13, which is a reserve component of the Air Force. *Id*. §§ 10101, 12107 (b)(2). When a person enlists in the Air National Guard, he must enlist in both a state ANG unit and the ANG of the United States, 10 U.S.C. § 12107, and meet all federal qualifications for the ANG of the United

States, 32 U.S.C. § 301. The federal government prescribes required training for national guard members and otherwise substantially regulates the state national guard units. *See* 32 U.S.C. § 110; *id.* § 104(b) (ANR units shall be organized according to regular Air Force regulation and as the Secretary of Defense provides). The federal government also provides funding, equipment, and other support for the National Guard units. *Id*. § 106. State National Guard units lose their federal recognition, as well as funding, equipment, and all other privileges, if they do not meet the requirements mandated by Congress. *Id.* §§ 105, 108.

The President and Congress have the power to "call up" National Guard units, or order them into active federal service, at any time they are needed for national defense or law enforcement purposes. 32 U.S.C. § 102 (Congress); 10 U.S.C. § 12406 (President). When Air National Guard members are called up to active federal service, they are in the "regular" Air Force, 10 U.S.C. § 10112, and they are relieved of duty in their state units, 32 U.S.C. § 325(a).

The National Guard constitutes a vital component of the system of national defense:

> In accordance with the traditional military policy of the United States, it is essential that the strength and organization of the Army National Guard and the Air National Guard as an integral part of the first line of defenses of the United States be maintained and assured at all times.

32 U.S.C. § 102. Moreover, the National Guard's importance to national military strength has increased significantly since the end of the Cold War and military

downsizing.[6]  Aplt. App. (Nelson) at 158-59.  Wyoming Adjutant General

Boenisch testified that the federal government has a policy of "total force" that

aims to ensure, among other things, that the National Guard will blend seamlessly

into national defense operations.  *Id.*

Commissioned officers, including Assistant Adjutant Generals, are thus

under dual state and federal control.  Although all officers are appointed by the

respective state in charge of the particular unit, U.S. CONST. art. 1, § 8, cl. 16; *see*

*also* 32 U.S.C. 101(6), these officers must be federally recognized, *see* 32 U.S.C.

§ 305.  To receive federal recognition, they must possess the qualifications

required by the federal government including the specific qualifications

established for the particular position (grade, rank, etc.) to which they are being

appointed in their state guard unit.  *Id*. § 307(a)(2); *see also* 10 U.S.C. §

12201(a); NGR 600-100 (4-1) (providing that officer appointments are a function

---

[6]Wyoming Adjutant General Boenisch testified that the military is composed of 50 to 100 percent Guard and Reserve members, depending on the weapons system or mission involved.  Aplee. App. (Nelson) at 210.  In 1998, the Wyoming National Guard's federal missions included two months of firefighting in Indonesia, providing airlift assistance to storm-stricken farmers in Roswell, New Mexico, deployments to Germany in support of operations Joint Guard and Joint Endeavor, both related to Bosnia peacekeeping efforts, deployments to Oman for Operation Southern Watch, and hosting the national training workshop for firefighting.  Aplee. App. (Nelson) at 17-18.  The Wyoming National Guard is the headquarters for the 115th field artillery brigade, which has battalions in three states, and therefore commands field artillery battalions that are part of Montana and Utah National Guard units.  Aplee. App. (Dillon) at 240.

of the state concerned but shall be conducted according to, inter alia, national defense organization and management principles and the needs of the armed forces). In other words, to be appointed an officer, both the state and federal government must concur in the appointment; the requirements are prescribed, and must be verified, by the federal government, but the particular selection from among qualified applicants is reserved for the state. NGR 600-100 (11-2). Officers take a dual oath to the state and federal governments upon assuming their commission. 32 U.S.C. § 304.

Federal regulations expressly discuss the creation of two AAGs to head the air and army divisions of each state unit, respectively, and further provide that the state must create this position in order to have an officer of the rank of brigadier general in its unit. NGR 36-1. Federal statutes and regulations do not set out the duties of the AAGs except for stating that they shall be commanders of the air and army divisions, NGR 600-100 (11-3(b)), and act as assistants to the federally-mandated position of Adjutant General (or Chief of Military Operations) for the state unit, *id*. (11-2). While duty details for all members are a command function, they must meet prescribed regulations and federal management practices, *id*. (7-1). In sum, the National Guard is an organization controlled and utilized by both the state and federal governments and constitutes a vital part of the nation's defense system.

## C

We turn now to whether the state's residency requirement for Assistant Adjutant Generals is valid under the Privileges and Immunities Clause. On appeal, the state agrees that the Privileges and Immunities Clause, and the two-step analysis applied by the district court, are the correct means of analyzing the lawfulness of the residency restriction.[7]

---

[7]Despite this concession, the state asserts that the residency restriction is constitutional because it is a "bona fide" residency requirement, by which the state apparently means to distinguish this *continuing* residency requirement from *durational* residency requirements that have been invalidated on right-to-travel and equal protection grounds. *See Dunn v. Blumstein*, 405 U.S. 330 (1972) (invalidating durational residency requirement for voting on right-to-travel and equal protection grounds); *Shapiro v. Thompson*, 394 U.S. 618 (1968) (invalidating durational residency requirement for receiving public assistance on right-to-travel grounds); *cf. Martinez v. Bynum*, 461 U.S. 321 (1983) (upholding continuing residency requirement for attending public schools). Where continuing residency requirements also impede an activity protected by the Privileges and Immunities Clause, however, they may still be void as unconstitutional under that Clause. *See, e.g.*, *Supreme Court v. Friedman*, 487 U.S. 59 (1988) (continuing residency requirement to "waive in" to state bar violates Privileges and Immunities Clause); *Supreme Court v. Piper*, 470 U.S. 274 (1985) (continuing residency requirement for admission to state bar violates Privileges and Immunities Clause). Thus, the state's bare assertion that this residency requirement is "bona fide" does not determine whether the requirement is constitutional under the Clause that the state has conceded is at issue.

In addition, at oral argument, the state asserted that the Militia Clause of the United States Constitution reserves to states the power to appoint "Militia" officers and that this reservation includes the power to restrict AAG officers in the Wyoming National Guard to state residents. *See* U.S. CONST. art. 1, § 8, cl. 15-16. The state did not make this argument in its appeal brief and does not provide any record cites showing it was presented to the district court. We therefore decline to address it. *See Lyons v. Jefferson Bank & Trust*, 994 F.2d

(continued...)

The Privileges and Immunities Clause provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the Several States." U.S. CONST. art. IV, § 2. "The provision was designed to 'place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.'" *Supreme Court v. Friedman*, 487 U.S. 59, 64 (1988) (quoting *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180 (1868)). For the purposes of the Clause, the terms "citizenship" and "residency" are "essentially interchangeable." *Id*. (citing *United Bldg. & Constr. Trades Council v. Mayor of Camden*, 465 U.S. 208, 216 (1984)).

In *Friedman*, the Supreme Court applied a two-prong test to determine whether a state restriction on nonresidents violates the Privileges and Immunities Clause. *Id*. at 64-54; *see also Supreme Court v. Piper*, 470 U.S. 274 (1985); *Baldwin v. Fish & Game Comm'n*, 436 U.S. 371 (1978). The Clause merely "'establishes a norm of comity without specifying the particular subjects as to which citizens of one State coming within the jurisdiction of another are guaranteed equal treatment.'" *Friedman*, 487 U.S. at 64 (quoting *Austin v. New Hampshire*, 420 U.S. 656, 660 (1975)). Accordingly, the first prong asks whether the activity the state restricts is

---

[7](...continued)
716, 721 (10th Cir. 1993) (court generally will not consider arguments raised for first time on appeal).

sufficiently basic to the livelihood of the Nation . . . as to fall within the purview of the Privileges and Immunities Clause. For it is only with respect to those 'privileges' and 'immunities' bearing on the vitality of the Nation as a single entity that a State must accord residents and nonresidents equal treatment.

*Id*. at 64-65 (quotations and citations omitted).

If the activity in question meets the above test, a second consideration under the first prong is whether the restriction falls within an exception to the Clause for residency requirements that are related to the state's ability to function as a sovereign. *See Piper*, 470 U.S. at 282 & n.13. The activities that fall within this exception include voting for and holding elective state office, activities that this involve, respectively, the state's ability to exist as a separate political community and the state's ability to function as a sovereign body. *Id*. The provision of state services or resources is also excepted. *Baldwin*, 436 U.S. at 383. These excepted activities are not privileges or immunities within the meaning of the Privileges and Immunities Clause. *Piper*, 470 U.S. at 282 n.13.

If we determine under the first prong that the challenged restriction deprives a nonresident of a protected privilege or immunity, under the second prong the restriction is invalid unless it is "closely related to the advancement of a substantial state interest." *Friedman*, 487 U.S. at 65.

# D

We are persuaded the residency restriction here violates the Privileges and Immunities Clause. Applying the first prong, we ask whether the activity the state restricts is a privilege or immunity that bears on the vitality of the nation as a single entity. *Id*. at 64. The activity in question is the ability to serve in the Wyoming National Guard. This activity entails membership in both a state national guard unit and the National Guard of the United States. *See* 10 U.S.C. §§ 10105-07, 10111-13. As part-time military service, it provides the only opportunity United States citizens have to volunteer to participate in defending their country without having to commit their career and lifestyle exclusively to military service. As such, we agree with the district court that serving in a state unit of the National Guard "bear[s] on the vitality of the Nation as a single entity." Aplt. App. (Nelson) at 53-54. Given the importance of the National Guard to overall national military power, such service is also "basic to the livelihood of the Nation." *Friedman*, 487 U.S. at 64. The Supreme Court has stated that "no provision of the Constitution has tended so strongly to constitute the citizens of the United States one people as [the Privileges and Immunities Clause]." *Paul v. Virginia*, 75 U.S. (8 Wall) at 180. Similarly, we can imagine few activities comparable to participating in national military service that tend to constitute United States citizens as "one people" and to promote a sense and a

-16-

mission of national unity. We therefore hold that participating in the Wyoming National Guard, including as an AAG, is a privilege under the Privileges and Immunities Clause.[8]

We next consider whether, as the state asserts, the AAG position falls under the exception to the Privileges and Immunities Clause for matters that relate to the state's ability to function as a sovereign body. *Piper*, 470 U.S. at 282. This exception includes residency requirements that are necessary for the state to operate as a "separate political community," such as for voting and holding elective state office, *id.* at 282 n.13 and, relatedy, residency requirements for activities or positions which are entrusted with "matters of state policy," *id.* at 282 (quoting *In re Griffiths*, 413 U.S. 717, 724), or are "close to the core of the political process," *id.* at 282 n.12.[9] The state contends, as it must, that the AAG

---

[8]With regard to whether serving as AAG in the National Guard is a protected "privilege," the state argued only that the activity was not protected as a "common calling," because "common calling" does not extend to public employment. The district court did not decide the issue. We similarly find it unnecessary to resolve whether the AAG position involves a "common calling," or the pursuit of employment that is therefore a "privilege" under the Privileges and Immunities Clause, *see United Bldg. & Constr. Trades Council v. Mayor of Camden*, 465 U.S. 208, 219 (1984), because we hold that participation in the National Guard constitutes a privilege protected for other, noneconomic reasons. *See Piper*, 470 U.S. at 281 & n.11 (protected privileges are not limited to economic activities) (citing *Doe v. Bolton*, 410 U.S. 179 (1973)). The only other argument the state asserted with regard to the first prong is that the office of AAG falls under the "state office" exception, which we address in the text.

[9]Similar language in cases dealing with restrictions on aliens, from which
(continued...)

-17-

position is both one that is part of the state's authority and military structure, and one that entails sufficient state authority. We are not convinced the AAG exercises state power of such importance, or even that the position involves primarily state rather than federal functions.

The state contends its state national guard unit is its "state militia" over which the Militia Clauses of the Constitution grant states plenary authority. *See* U.S. CONST. art. I, § 8, cl. 15-16. The state correspondingly argues that a *national* militia may be created only under Clause 12 of Article 1 section 8 of the Constitution, which provides Congress may raise and regulate armies.[10] *Id.* art. I,

---

[9](...continued)
*Piper* draws, *see Supreme Court v. Piper*, 470 U.S. 274, 282-83 (quoting *In re Griffiths*, 413 U.S. 717, 724 (1973)), expresses the nature of this exception more completely:

> [S]ome state functions are so bound up with the operation of the State as a governmental entity as to permit the exclusion from those functions of all persons who have not become part of the process of self-government. . . . "Such power inheres in the State by virtue of its obligation, already noted above, to preserve the basic concept of a political community.. . . And this power and responsibility of the State applies, not only to the qualifications of voters, but also to persons holding state elective or important nonelective executive, legislative, and judicial positions, for officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government."

*Ambach v. Norwick*, 441 U.S. 68, 73-74 (1979) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)); *see also Cabell v. Chavez-Salido*, 454 U.S. 432, 438-39 (1982) (upholding requirement that peace officers be U.S. citizens).

[10]Clause 12 provides "[t]he Congress shall have Power To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years." U.S. CONST. art. 1, § 8, cl. 12.

-18-

§ 8, cl. 12.  The state further contends that the only national militia Congress actually created under Clause 12 is the regular armed forces, and possibly the National Guard when it is called up to active federal duty.  The state's contention is in error.  As discussed *supra*, the Militia Clauses are a grant of power to Congress, not merely to the states.  *See Perpich v. Dep't of Defense*, 496 U.S. 334, 351-53 (1990) (that the Militia Clauses of the Constitution grant some power to states over the National Guard does not act as an independent limit on power over the National Guard granted to Congress in the same Clauses).  In addition, virtually all state control over its national guard unit is subject to federal regulation, and the National Guard is a component of the national defense forces at all times whether called up to federal service or not.  The only other defense force a state is permitted to maintain is its unorganized militia, which is not subject to being called up as a reserve defense force by the federal government and is therefore entirely separate from the National Guard.  *Id.* § 109(a),(c); *see, e.g.*, WY STAT. ANN. 19-7-101.

The state also argues that the residency requirement does not violate the Constitution because the Militia Clauses and federal statutes and regulations grant states the power to appoint officers and to regulate these positions according to state law.  *See, e.g.*, NGR 600-100 (11-2).  These provisions notwithstanding, the exercise of state power must conform to the Constitution.  *See* U.S. CONST. art.

VI; *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 429-30 (1819).

Moreover, these grants of power do not in themselves expand the state governance exception to the Privileges and Immunities Clause, or create their own stand-alone exception for state national guard officers.

In addition, contrary to the state's contention, the AAG position is not entirely or even primarily a "state" position. The state urges us to adopt the "command and control" test applied by the Sixth Circuit in *Gilbert v. United States,* 165 F.3d 470 (6th Cir. 1999), to determine whether the AAG position is state or federal. In *Gilbert* the court held Kentucky National Guard members did not violate the Posse Comitatus Act (PCA)[11] by participating in state anti-drug efforts because the defendants were in state rather than federal service at the time in question. In so holding, the court stated that the authority having "command and control" over the members at the time in question determined whether they were in federal or state service. *Id.* at 473; *see also United States v. Hutchings*, 127 F.3d 1255, 1258 (10th Cir. 1997).

We decline to apply that test to this case. While a "command and control" test may be appropriate for determining the character (state or federal) of

---

[11]The Posse Comitatus Act, 18 U.S.C. § 1385, is intended "to prevent the use of the federal army to aid civil authorities in the enforcement of civilian laws." *Gilbert*, 165 F.3d at 472; *see also United States v. Hutchings*, 127 F.3d 1255, 1257 (10th Cir. 1997).

particular actions undertaken by Guard members at a particular time, it is not appropriate for determining the overall character of the National Guard and the AAG position. If we were to utilize this test to examine the status of the AAG while not federally activated, we might well determine the AAG is more state than federal; if we were to undertake the same inquiry while an AAG was federally activated, we would no doubt conclude the AAG was a federal actor. Neither application would capture the dual nature and objectives of the Wyoming National Guard for the purpose of determining whether the AAG office, in its entirety, is a state or federal office, or both.

Instead, we must examine the National Guard and the AAG position in their entirety. The Adjutant General is a full-time position and is required to be a state resident by both federal and state statutes.[12] 32 U.S.C. § 314; WY. STAT. ANN. § 19-7-103(a)(iv). The state points out that if the Adjutant General becomes unavailable or incapacitated, under state law the AAG will execute his duties. WY. STAT. ANN. § 19-7-105(a). The state argues this responsibility makes the AAG position primarily "state" in nature. The state also argues the AAG's other duties are primarily related to state interests and objectives.

_____

[12]We express no opinion here on the residency requirement for the Adjutant General position. We do, however, note the significant differences between that position and the AAG positions.

-21-

We agree with the district court that the AAG position is, overall, primarily federal in nature. As discussed *supra*, the National Guard is an entity over which the federal government and state government possess dual control. Even when the Guard is not federally activated, however, the Wyoming Air and Army National Guard units remain reserve components of the United States Air Force and Army respectively, and most if not all functions performed by the state are subject to federal requirements and regulations. A primary purpose of maintaining a National Guard is to provide reserve forces to supplement the regular (full-time) national armed forces, even if non-active national guard units may also be used for purely state purposes. In addition, the National Guard has become increasingly important to national defense and has become deployed for numerous federal missions overseas.

The AAG position is provided for by federal law. *See* NGR 36-1; NGR 600-100 (11-3). While Wyoming state law provides for the appointment of AAGs, WY. STAT. ANN. § 19-7-104, it merely implements a federal requirement that, in order for the state unit to include officers at the rank of brigadier general, state law must create an AAG or an equivalent position, NGR 36-1. The federal government pays the AAG salary except while the AAG is called into active state duty. *See, e.g.*, WY. STAT. ANN. § 19-9-201. Moreover, the AAG is a part-time position.

Except for circumstances requiring the AAG to execute the Adjutant General's duties, an AAG's duties are not specifically prescribed by state or federal law. The record reflects that an AAG's duties include, inter alia, implementing federal training requirements, recruiting new members, assisting with federal deployment, participating in military selection boards, and evaluating and implementing state and federal strategic plans. An AAG is also empowered to conduct court martials and confine persons to jail. These duties do not appear to be solely or even primarily state-related. Even those duties that are not solely federal, such as recruitment, are concerned with the needs and objectives of the state guard unit in general, which is a dual state-federal organization. Under these circumstances, we are not convinced the Wyoming National Guard and the AAG positions are primarily "state" in nature.

Even if we were to conclude that the AAG position is somewhat more state than federal in nature, it still does not constitute an exempt state governmental function under the exception to the Privileges and Immunities Clause unless it involves the "exercise of actual governmental power," *Piper*, 470 U.S. at 293, places the person "so close to the core of the political process as to make him a 'formulator of government policy,'" *id.* at 282 n.12 (quoting *In re Griffiths*, 413 U.S. at 729), or is otherwise necessary to the existence of the state as a political entity, *id.* at 282 & n.13. We agree with the district court that the AAG does not

fall within the Privileges and Immunities exception because AAG responsibilities do not involve state policy formulation, do not rise to the level of exercising actual power at the core of state government, and are not otherwise vital to the state's ability to function as a sovereign political body.

In arguing that the AAG is a state officer who exercises power vital to state sovereignty, the state again points to the AAG's responsibility for standing in as acting Adjutant General if necessary. The state also argues the AAG engages in the formulation of state policy, and as a military officer is closely connected to the core of state power. As examples of policy formulation and other significant exercises of state power, the state lists several duties AAGs perform including developing and implementing a process for staff evaluation, sitting on the council that formulates and implements strategic plans for the Wyoming National Guard, and working on issues such as manpower, readiness training, recruitment, and quality management. Aplt. Br. (Nelson) at 32-34. Given that the Wyoming National Guard pursues both federal and state objectives, the state does not explain how these duties involve the exercise of state rather than federal power. Moreover, these duties also involve evaluation and reporting, and policy implementation rather than policy formulation, and therefore do not constitute independent creation of policy that touches on the "core" of state power. *See Piper*, 470 U.S. at 282 n.12.

The dual federal-state nature of the National Guard, and the federal nature of many of the AAG's responsibilities, preclude the conclusion that AAG duties involve the exercise of significant power at the core of the state's sovereignty. The state's remaining argument, that state power is implicated by virtue of the AAG's responsibility to execute the duties of the Adjutant General while that office is vacant, is too minimal a basis on which to conclude the AAG is a state office. Like the district court, we are persuaded that "the jump from State elected office to Federal/State military appointment is too big for this Court to make." Aplt. App. (Nelson) at 55.

Finally, underlying the state's preceding arguments seems to be an assertion that any exercise of military power within the state makes for an exempt state function because of the sovereign nature of state military power.[13] This argument

---

[13]The state also compares the National Guard to a police force, noting that residency requirements for police have been upheld by the Supreme Court. However, they have been upheld only on equal protection/right to travel grounds, not on Privileges and Immunities grounds. *See McCarthy v. Philadelphia Civil Service Comm'n*, 424 U.S. 645 (1976) (per curiam) (upholding municipal residency requirement for firemen against right to travel challenge); *Detroit Police Officers Ass'n v. City of Detroit*, 405 U.S. 950 (1972) (dismissing due process and equal protection challenge to municipal police residency requirement for want of substantial federal question); *cf. United Bldg. & Constr. Trades Council*, 465 U.S. 208 (holding that municipal residency requirement for public contractors falls within purview of Privileges and Immunities Clause); *Hicklin v. Orbeck*, 437 U.S. 518 (1978) (state law containing residency hiring preference violative of Privileges and Immunities Clause); *but see Saenz v. Roe*, 526 U.S. 489, 500-01 (1999) (characterizing, in dicta, the Privileges and Immunities Clause

(continued...)

is unavailing in the context of a military organization over which the state and federal governments have dual control, and one of whose primary purposes is to provide reserve forces for the national defense. We therefore conclude that the position of AAG is not exempt from the restrictions of the Privileges and Immunities Clause.

We now consider the second prong of the analysis, whether the residency requirement is "closely related to the advancement of a substantial state interest." *Friedman*, 487 U.S. at 65. In this regard, the state reiterates arguments it made in contending the position of AAG is an exempt state function, asserting in essence that the state has an interest in limiting the position to residents because the position involves the exercise of state power and involves matters of state concern.

We conclude this asserted state interest is not sufficiently substantial. As we discussed at length *supra*, the AAG's responsibilities do not relate solely to state matters. Therefore, even if state responsibilities translated into a state

---

[13](...continued)
as comprising one component of the right to travel). The other cases cited by the state involve the right to exclude aliens from state positions, rather than nonresident-U.S. citizens, and were analyzed under the Equal Protection Clause rather than the Privileges and Immunities Clause, which does not protect aliens. *See Cabell v. Chavez-Salido*, 454 U.S. 432 (1982); *Foley v. Connelie*, 435 U.S. 291 (1978). Finally, all of these cases involve restrictions on state or municipal public employment, and the privilege involved here is the ability to serve in the National Guard.

interest in having a resident charged with those responsibilities, which we do not believe the state has shown in any case, the AAG's substantial *federal* duties and objectives do not reflect any need for a Wyoming resident. As the district court concluded, these federal duties and objectives require the opposite: that the Wyoming National Guard draw on nonresidents to fill its ranks, including its officer positions. As we have previously noted, approximately fifty-one percent of the entire Wyoming Air National Guard, and twenty percent of the Wyoming Army National Guard, are composed of nonresidents. As such, any state interest based on state residency conflicts with the federal interest simultaneously at stake with regard to the AAG positions and the purpose of the Wyoming National Guard. Consequently, we also agree with the district court that in terms of state interests related to the performance of the AAGs and the National Guard, nonresidents do not "constitute a peculiar source of the evil" that the residency requirement addresses. *United Bldg. & Constr. Trades Council*, 465 U.S. at 222 (quoting *Toomer v. Witsell*, 334 U.S. 385, 398 (1948)).

Moreover, practical considerations belie the state's claim that residency is even in the state's interests. For example, the state presented testimony that the ability to travel quickly to national guard headquarters in Cheyenne might be an issue. Yet both Ms. Nelson and Mr. Dillon live in Fort Collins, Colorado, only fifty miles from Cheyenne, while many national guard members who live in

Wyoming travel more than two hundred miles to perform their National Guard service. The state military selection board could have considered residency as a criteria but did not. In addition, the Governor, Wyoming National Guard officers, and Adjutant General Boenisch all opposed the residency requirement. Aplt. App. (Nelson) at 99, 162, 172. This supports the district court's conclusion that the state has no substantial interest in limiting AAGs to state residents. As the district court noted, the only other justification the state advanced is that, in effect, it simply wants to reserve these positions for state residents. This is not a substantial state interest justifying restrictions on a position that implicates federal military interests and involves a privilege protected by the Constitution.

Having determined the residency restriction is not supported by a legitimate state interest, we need not consider whether the restriction is narrowly enough drawn. We hold that the residency restriction violates the Privileges and Immunities Clause. Consequently, the removals of Ms. Nelson and Mr. Dillon from their positions as AAGs violated the Constitution.


**III**

The state also appeals the district court's holding that the proper remedy for the unconstitutional removals is reinstatement. The state asserts that the Eleventh Amendment bars reinstatement, an issue we address because the state may raise

this defense at any point in the proceedings. *J.B. v. Valdez*, 186 F.3d 1280, 1285 (10th Cir. 1999).

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI.  The Supreme Court has held that the Amendment bars suit against a state unless the state waives immunity or Congress has validly abrogated immunity.  *See Seminole Tribe v. Florida*, 517 U.S. 44, 54-55 (1996). Neither exception applies here because the state has not waived immunity and the Supreme Court has held that Congress did not abrogate state sovereign immunity with the passage of section 1983.  *See Quern v. Jordan*, 440 U.S. 332, 338-40 (1979); *Edelman v. Jordan*, 415 U.S. 651, 677 (1974).

Notwithstanding state sovereign immunity, "where prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar."  *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 276-77 (1997).  Under the *Ex parte Young* doctrine, individuals may bring suit for prospective injunctive relief to prevent ongoing constitutional violations against individual state officials named in their official capacity even if the state is immune.  *Ex parte Young*, 209 U.S. 123 (1908). However, the Supreme Court has narrowed the availability of prospective

injunctive relief under *Ex parte Young* in two important respects. *See Coeur d'Alene*, 521 U.S. at 281-83; *Seminole Tribe*, 517 U.S. at 74. The state argues both limitations apply to this case.

In *Seminole Tribe*, the Court held that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state official based upon *Ex parte Young*." *Seminole Tribe*, 517 U.S. at 74. The state argues Congress prescribed such a statutory scheme when it enacted 10 U.S.C. § 1552, which provides for "Correction of military records: claims incident thereto." The state has provided no authority to support its conclusory assertions that the administrative remedy provided by section 1552 was intended to supplant a constitutional challenge to a state provision, or that the Secretary who may "correct military records" under that section is authorized to adjudicate such a challenge. Section 1552 provides an administrative mechanism by which *federal* military records may be corrected; it is not a scheme for enforcing a statutorily created right against a state as contemplated in *Seminole Tribe*.[14] Plaintiffs' section 1983 claims arise under the

_____

[14]We note that exhaustion of the administrative remedy provided by 10 U.S.C. § 1552 has not been required where the "issues involved are purely legal, requiring no exercise of military discretion or expertise. The federal courts are in a better position to consider the constitutional issues presented" than is the Board
(continued...)

-30-

Constitution. We have held that the *Seminole Tribe* limitation, by the language of that decision, applies only to a "'*statutorily* created right.'" *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1997 (10th Cir. 1999) (quoting *Seminole Tribe*, 517 U.S. at 74) (emphasis added). Because section 1983 "did not create any substantive rights, but merely enforce[s] existing constitutional and federal statutory rights, we hold that *Seminole Tribe's* detailed remedial scheme analysis does not apply here." *Id.* (citations omitted).

Turning to the second limitation, courts may not provide prospective injunctive relief under *Ex parte Young* where doing so would implicate "special sovereignty interests" and result in an intrusion that is the "functional equivalent" of a form of relief otherwise barred by the Eleventh Amendment. *Coeur d'Alene Tribe*, 521 U.S. at 281. To make this determination we ask:

> first, whether the relief being sought against a state official implicates special sovereignty interests; second, if the answer to the first question is in the affirmative, we then ask whether the requested relief is the functional equivalent to a form of legal relief against the state that would otherwise be barred by the Eleventh Amendment.

*Ellis*, 163 F.3d at 1198 (citation and internal quotations omitted).

We thus consider first whether reinstatement implicates special sovereignty interests of the state of Wyoming. The state contends such interests are

---

[14](...continued)
of Correction of Military Records under section 1552. *Committee for GI Rights v. Callaway*, 518 F.2d 466, 474 (D.C. Cir. 1975).

implicated because the Wyoming National Guard is an essential element of state sovereignty, and because the AAG may be called upon to replace the Adjutant General.

In *Coeur d'Alene Tribe*, the plaintiff sought an injunction granting it exclusive use, occupancy, and right to quiet enjoyment of the banks and bed of Lake Coeur d'Alene, various navigable tributaries and effluents, and other property lying within the original boundaries of the Coeur d'Alene reservation. 521 U.S. at 264-66. The Court held granting the requested relief implicated special state sovereignty interests because submerged lands and navigable waters "uniquely implicate sovereign interests." *Id.* at 284. The Court traced the roots of this principle through Justinian, English common law, and the Magna Carta, and finally concluded that American law has only expanded the importance of public, and therefore state, control over navigable waters. *Id.* at 284-87; *see also ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1193 (10th Cir. 1998) (injunctive tax relief implicates special state sovereignty interests because "it is impossible to imagine that a state government could continue to exist without the power to tax.").

While we agree that governmental control over military power is a principle whose roots are undoubtedly as pedigreed as sovereignty over navigable waters, here the government control in question is not exclusively that of the state. We

-32-

have already discussed the dual state-federal nature of the Wyoming National Guard. The state of Wyoming does not have exclusive control over its National Guard unit, and in this sense the Guard does not constitute an essential element of the state's sovereignty. *See J.B.*, 186 F.3d at 1287 (welfare program "partially funded by the federal government" does not implicate special sovereign interests). Moreover, the Guard's substantial *federal* objectives, regulation, activities, support, and composition constitute an important federal interest. A conclusion that the Wyoming National Guard implicates an essential element of state sovereignty would conflict with this federal interest.[15] Similarly, the AAGs are part-time officers in the Wyoming National Guard who perform functions largely directed at accomplishing federal objectives. We conclude the reinstatement of an officer with these particular characteristics to the Wyoming National Guard would not invade core attributes of Wyoming's sovereignty.

We also consider the second question, whether reinstatement is a form of relief that is the functional equivalent of money damages or a similar form of prohibited relief.[16] *Ellis*, 163 F.3d at 1198. Forms of prohibited relief have

---

[15]For similar reasons, the fact that courts owe certain deference to the judgment of military authorities concerning military interests, *see, e.g., Goldman v. Weinberger*, 475 U.S. 503, 507 (1986), does not dictate that we must defer to the state's asserted military authority here where, as we explain *supra*, the state has misconceived the nature and scope of that authority.

[16]The state failed to make any argument in this respect. In the past, we
(continued...)

included money paid from the public treasury, *Edelman*, 415 U.S. at 663, and a

quiet title action, *Coeur d' Alene Tribe*, 521 U.S. at 281-82.

In *Coeur d'Alene Tribe*, the Court found that the injunctive relief sought

was comparable to a quiet title action because "substantially all benefits of

---

[16](...continued)
have expressed some uncertainty about "whether sua sponte consideration [of Eleventh Amendment issues] is obligatory or discretionary . . . ." *V-1 Oil Co. v. Utah State Dep't of Pub. Corr.*, 131 F.3d 1415, 1419 (1997). In doing so we noted the Supreme Court's conflicting statements on this question. *Id.* at 1419-20. Thus, in *Patsy v. Board of Regents*, 457 U.S. 496, 515 n.19 (1982), the Court held that while the Eleventh Amendment defense "sufficiently partakes of the nature of a jurisdictional bar" that the state may raise it for the first time on appeal, it need not be raised and decided by a court sua sponte. Two years later the Court stated that "the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art[icle] III," thus indicating the Eleventh Amendment is a jurisdictional limit courts must consider sua sponte. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). More recently, the Court has stated that judicial consideration of Eleventh Amendment issues sua sponte is discretionary, not mandatory. *See Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998) ("Nor need a court raise [an Eleventh Amendment] defect on its own. Unless the State raises the matter, a court can ignore it."); *Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998) (Rehnquist, C.J., for unanimous Court) ("While the Eleventh Amendment is jurisdictional in the sense that it . . . can be raised at any stage in the proceedings, we have recognized that it is not coextensive with the limitations on judicial power in Article III."); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997) (The Eleventh Amendment "enacts a sovereign immunity from suit, rather than a nonwaivable limit on the Federal Judiciary's subject-matter jurisdiction."). Despite these unequivocal pronouncements, the Court also stated in one of these recent cases that it had not yet decided whether "Eleventh Amendment immunity is a matter of subject-matter jurisdiction." *Wisconsin Dep't of Corrections*, 524 U.S. at 391-22. In an abundance of caution, we will follow our traditional practice of considering state immunity issues on our own motion. *See V-1 Oil Co.*, 131 F.3d at 1420.

-34-

ownership and control would shift from the State to the [plaintiff]." *Coeur d'*
*Alene Tribe*, 521 U.S. at 282. The relief, moreover, had "consequences going
well beyond the typical stakes in a real property quiet title action" because it
would "diminish, even extinguish, the State's control over a vast reach of lands
and waters." *Id.* Similarly, in *ANR Pipeline* this court considered whether a
prospective injunction ordering tax breaks and the recertification of property tax
assessments, to enforce meritorious equal protection claims with respect to state
taxes, was the functional equivalent of a form of prohibited relief. *ANR Pipeline
Co.*, 150 F.3d at 1193-94. We determined that a "request to rewrite Kansas'
property tax code with respect to . . . natural gas pipelines" is "fully as intrusive
into the state's sovereignty as would be a money judgment . . . ." *Id.* at 1194
(quotation and citation omitted).

We are simply not persuaded that the reinstatements at issue here are the
practical equivalent of money damages, even if they have a slight ancillary effect
on the state treasury. *See, e.g., id.* at 1189. Accordingly, we hold the Eleventh
Amendment is not a bar to reinstatement.

Finally, the state asserts that a person who is removed from a position in
violation of the Constitution must demonstrate a property interest in that position
in order to be reinstated. While it is true that an employee dismissed by the state
who is suing for procedural due process must demonstrate a property interest in

her former position, *see generally Board of Regents v. Roth*, 408 U.S. 564 (1972), the requirement of a property interest has absolutely no application to claims of substantive constitutional violations by the state.[17]  *See, e.g., Perry v. Sindermann*, 408 U.S. 593, 596-98 (1972) (lack of contractual right to employment does not defeat claim of dismissal in violation of First Amendment because "there are some reasons upon which the government may not rely" for dismissal).  Ms. Nelson and Mr. Dillon need not demonstrate a property interest in

---

[17]Moreover, it is evident Ms. Nelson and Mr. Dillon do possess a property interest in their respective AAG positions and the state ignores its own clearly established law in arguing otherwise.  The state asserts Ms. Nelson and Mr. Dillon were at-will employees, claiming in support that the dismissal of military officers is governed by WY. STAT. ANN. § 9-1-202 (LexisNexis 2001).  That statute provides any person "may be removed by the governor, at the governor's pleasure, if appointed by the governor to serve as head of a state agency, department or division, or as a member of a state board or commission." *Id.* § 9-1-202(a).  However, the express language of the Wyoming statute governing *the dismissal of national guard officers* provides such officers are not at-will employees:

> [A]ll officers appointed in the national guard of Wyoming except the adjutant general shall hold their appointments until they have reached sixty-four (64) years of age unless retired prior to that time by reason of resignation, disability, withdrawal of federal recognition, transfer to armed forces reserves *or for cause to be determined by a courts-martial or administrative board legally convened for that purpose*.

*Id.* § 19-9-301 (b) (emphasis added).  *See also Pearson v. Hansen,* 401 P.2d 954 (Wyo. 1965) (holding 19-9-301, not 9-1-202, controls removal of national guard officers and therefore such officers may be removed only for cause).  The state's argument that the more general statute governing state officials controls here, and that Ms. Nelson and Mr. Dillon are at-will employees, is thus as spurious as its assertion that Ms. Nelson and Mr. Dillon require a property interest to assert their constitutional claims in the first place.

-36-

the AAG positions; they are both entitled to reinstatement without such a showing.

For the foregoing reasons, the order of the district court is **AFFIRMED**.