FILED
United States Court of Appeals
Tenth Circuit

September 10, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ERIC A. HANSON,

      Plaintiff - Appellee/
Cross-Appellant,

v.

MAJOR GENERAL HARRY M.
WYATT, III, in his official capacity as
the Adjutant General, State of
Oklahoma,

      Defendant - Appellant/
Cross - Appellee.

No. 06-6136, 06-6204

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 05-CV-486-M)**

---

Kevin L. McClure, Assistant Attorney General, Oklahoma Attorney General's
Office, Oklahoma City, Oklahoma, for Defendant - Appellant/Cross-Appellee.

Timothy D. DeGiusti (James E. Warner, III, with him on the briefs), of Holladay,
Chilton & DeGiusti, PLLC, Oklahoma City, Oklahoma, for Plaintiff -
Appellee/Cross-Appellant.

---

Before **BRISCOE**, **HARTZ**, and **GORSUCH**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

Colonel Eric A. Hanson, who had been removed from the Oklahoma Army National Guard, filed suit against Major General Harry M. Wyatt III in his official capacity as Adjutant General for the State of Oklahoma, seeking reinstatement to his former position plus back pay and retirement points. His claim arises from an alleged violation by a selective retention board (SRB) of a federal regulation governing its procedures. The SRB recommended that Col. Hanson not be retained as a Colonel. Col. Hanson appealed to Maj. Gen. Wyatt on the ground that the SRB had violated the regulation. After that appeal was denied, Col. Hanson sought relief from the Army Board for Correction of Military Records (ABCMR), which rejected his claim. He then filed this suit in the United States District Court for the Western District of Oklahoma.

Col. Hanson contends (1) that the SRB violated an Army National Guard regulation by reviewing his status while he was simultaneously sitting on another SRB and (2) that this violation infringed his right to constitutional due process. The district court decided that the SRB violated the regulation and granted Col. Hanson summary judgment, ordering his reinstatement with retirement points. Maj. Gen. Wyatt has appealed, contending, among other things, that "[t]he Military administrative remedies and appeal process was [Col. Hanson's] exclusive remedy in this case." Aplt. Br. at 9 (emphasis omitted) We reverse.

As we discuss below, claims analogous to Col. Hanson's are permitted in federal court. The United States Supreme Court has recognized two "alternative remedies available to a servicemember demanding to be kept on the rolls." *Clinton v. Goldsmith*, 526 U.S. 529, 537 (1999). The servicemember can seek review of a decision by the ABCMR under the Administrative Procedure Act (APA), 50 U.S.C. § 557 et seq., or can sue the United States under the Tucker Act, 28 U.S.C. § 1491, or the Little Tucker Act, 28 U.S.C. § 1346(a)(2). *See Clinton*, 526 U.S. at 539–40. We hold, however, that there was no proper basis for this suit for violation of the National Guard regulation. We need not decide whether Col. Hanson may have had some judicial remedy in another court (such as Oklahoma state court) or against another party (such as the United States or the Secretary of the Army). The district court issued its judgment without identifying a cause of action that would permit Col. Hanson to seek relief in federal court against Maj. Gen. Wyatt for violation of the regulation, and Col. Hanson has not remedied that omission on appeal. We also hold that Col. Hanson has not stated a claim for denial of constitutional due process.

**BACKGROUND**

The National Guard is a state/federal hybrid. Our Constitution grants Congress authority

> [t]o provide for organizing, arming, and disciplining the Militia, and
> for governing such Part of them as may be employed in the Service

of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.

U.S. Const. art. I, § 8, cl.16. The National Guard is composed of those portions of state militias that are "federally recognized." 32 U.S.C. § 101(4). The federal government recognizes a "unit or organization of the National Guard," *id*. § 307(a)(1), and sets standards for recognition of individual officers, *id*. 307(a)(2), (3). Thus, members of the National Guard hold dual enlistments in both a state militia (a State national guard) and a federal force (the National Guard of the United States). *See Perpich v. Dep't of Def.*, 496 U.S. 334, 345 (1990). "In the latter capacity they bec[o]me a part of the Enlisted Reserve Corps of the Army, but unless and until ordered to active duty in the Army, they retain[] their status as members of a separate State Guard unit." *Id*.

Each state has an adjutant general, whose duties are set by state law. *See* 32 U.S.C. § 314(a). The Governor of Oklahoma is the Commander in Chief of the state's military department, "with the Adjutant General as the executive and administrative head thereof." Okla. Stat. Ann tit. 44, § 21; *see id*. § 26 (duties of adjutant general). The Oklahoma militia is composed of able-bodied citizens (and persons who have declared their intent to become citizens) between the ages of 17 and 70, and is divided into three classes: "The National Guard, the Oklahoma State Guard, and the Unorganized Militia." *Id*. § 41. An officer may be

discharged by the Governor for unfitness upon the recommendation of a three-member efficiency board convened by the Governor. *Id.* § 44.

Col. Hanson joined the Oklahoma Army National Guard in 1980. As a colonel who had served more than 20 years, he was subject in 2003 to review by an SRB. The regulation governing SRBs is the Department of the Army's National Guard Regulation (NGR) 635-102. *See* 10 U.S.C. § 14704(c) (authorizing such regulations). The goals of the review process are:

> a. Ensuring that only the most capable officers are retained beyond 20 years of qualifying service for assignment to the comparatively few higher level command and staff positions.
> b. Providing career incentive.
> c. Ensuring an opportunity for advancement to the higher grades at the peak years of an officer's effectiveness.

NGR 635-102(3). The SRB makes recommendations to the state adjutant general, who is empowered to overturn a nonretention recommendation. NGR 635-102(5)(j)(1)(b). When a nonselected officer loses federal recognition, the officer can no longer serve in the Army National Guard but is transferred to the United States Army Reserve. *See* 10 U.S.C. § 12213(b); NGR 635-102(7)(a).

"[T]o be reinstated as an officer of the [Army] National Guard, an officer must pursue remedies both within [the Army National Guard of the United States] and within the [Army] National Guard of his state." *Penagaricano v. Llenza*, 747 F.2d 55, 57 (1st Cir. 1984), *overruled in part on other grounds by Wright v. Park*, 5 F.3d 586, 590–91 (1st Cir. 1993). For the federal component of relief, the

officer may seek review by a civilian Board for Correction of Military Records (BCMR) established for one of the Services. *See* 10 U.S.C. § 1552. As stated in 32 C.F.R. § 581.3(a), "[T]he policies and procedures for correction of military records by the Secretary of the Army, acting through the Army Board for Correction of Military Records (ABCMR)" are set forth in 32 C.F.R. § 581.3. The language "correction of military records" may be somewhat misleading, because the authority of BCMRs goes well beyond correcting paperwork. The ABCMR "can reinstate [the officer] in a comparable active federal reserve status, restore his pay and order compensatory back pay." *Penagaricano*, 747 F.2d at 57; *see* 10 U.S.C. § 1552(c); *Christoffersen v. Washington State Air Nat'l Guard*, 855 F.2d 1437, 1442 (9th Cir. 1988); *Thornton v. Coffey*, 618 F.2d 686, 692–93 (10th Cir. 1980). It cannot, however, "direct his reinstatement in the National Guard of the state." *Penagaricano*, 747 F.2d at 57. That would be a matter for the state adjutant general.

In April 2003 an SRB recommended Col. Hanson for nonretention. Relying on introductory language in NGR 635-102 stating that it "does not apply to . . . voting members of current selection boards," he appealed to Adjutant General Wyatt on the ground that he had been serving on an SRB when he was recommended for nonretention. Maj. Gen. Wyatt denied the appeal. Col. Hanson sought relief from the ABCMR, but the decision of the Board denied relief

because "[t]he evidence presented d[id] not demonstrate the existence of a probable error or injustice." J. App. at 23. The Board's decision noted the following regarding the consequences of the nonselection decision:

> The [adjutant general] . . . advised that the non-selection action taken by the SRB only withdrew [Col. Hanson's] State appointment in the [Oklahoma Army National Guard]. [Col. Hanson] still retains his Federal rank and status and may, at his request, transfer to the Retired Reserve. However, if [Col. Hanson] does not select that option, his orders will indicate transfer to Army Reserve Personnel Center with assignment to the United States Army Control Group (Reinforcement).

J. App. at 21. Col. Hanson then filed the present suit. The district court held that the SRB's action violated NGR 635-102 and that the nonretention decision was therefore invalid; it ordered Col. Hanson's reinstatement with retirement points.

**DISCUSSION**

Col. Hanson contends that there was no bar to the district court's granting relief based on the violation of NGR 635-102. Maj. Gen. Wyatt counters, however, that Col. Hanson's sole avenue of relief is through the military's internal administrative and appellate procedures. Maj. Gen. Wyatt's brief focuses on court decisions denying various claims implicating military affairs. In these cases the plaintiff invoked a statute or a constitutional doctrine that would appear on its face to encompass the plaintiff's claim, but the court carved out an exception for classes of claims that would create improper interference with the

-7-

administration of the armed forces. For example, although the Federal Tort Claims Act (FTCA) contains no language barring suits by servicemembers against the government, such suits have been severely limited. *See*, *e.g.*, *United States v. Shearer*, 473 U.S. 52, 58 (1985) (rejecting FTCA claim by estate of soldier murdered by a fellow soldier while off-base and off-duty); *Feres v. United States*, 340 U.S. 135 (1950) (leading case). Likewise, the doctrine established in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which permits suits against federal officials for constitutional violations, does not encompass suits involving "injuries that arise out of or are in the course of activity incident to military service." *United States v. Stanley*, 483 U.S. 669, 684 (1987). And this court has rejected a plaintiff's claims against the Oklahoma National Guard and its Adjutant General under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (ADEA), and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. *See Costner v. Okla. Army Nat'l Guard*, 833 F.2d 905, 907 (10th Cir. 1987).

Maj. Gen. Wyatt infers from these opinions a general prohibition on suits regarding "intraservice military personnel dispute[s]." Aplt. Br. at 6. Although we agree that these decisions certainly caution courts about being too eager to uphold a claim impacting the military, we cannot accept Maj. Gen. Wyatt's broad generalization. In particular, it is inconsistent with the Supreme Court's

unanimous opinion in *Clinton*, 526 U.S. 529, which endorsed certain types of judicial review of claims like Col. Hanson's. The issue in the case was the authority of the Court of Appeal for the Armed Forces (CAAF) to issue an injunction prohibiting the removal of a court-martialed servicemember from the Air Force rolls. The Court held that the CAAF, whose jurisdiction is limited to review of court-martial cases, *see id.* at 535, lacked jurisdiction to issue the injunction because the injunction was not in aid of its jurisdiction, *see id.* at 535–37. In addition, it held that even if the CAAF had jurisdiction, the injunction was impermissible because the servicemember had adequate remedies at law. The Court noted that the servicemember could seek relief from the Air Force Board of Correction for Military Records—the Air Force analog to the ABCMR, which denied relief to Col. Hanson. It then observed that judicial review could also be available:

> Respondent may also have recourse to the federal trial courts. We have previously held, for example, that "[BCMR] decisions are subject to judicial review [by federal courts] and can be set aside if they are arbitrary, capricious, or not based on substantial evidence." *Chappell v. Wallace*, 462 U.S. 296, 303 (1983). A servicemember claiming something other than monetary relief may challenge a BCMR's decision to sustain a decision to drop him from the rolls (or otherwise dismissing him) as final agency action under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*; see §§ 704, 706. For examples of such challenges entertained in the district courts or courts of appeals, see *Roelofs v. Secretary of Air Force*, 628 F.2d 594, 599–601 (CADC 1980) (proceeding in District Court under APA raising due process challenge to administrative discharge based on conviction of civilian offence); *Walker v.*

*Shannon*, 848 F. Supp. 250, 251, 254–255 (DC 1994) (suit under APA for review of Army BCMR decision upholding involuntary separation).  In the instances in which a claim for monetary relief may be framed,  a servicemember may enter the Court of Federal Claims with a challenge to dropping from the rolls (or other discharge) under the Tucker Act, 28 U.S.C. § 1491.  *See, e.g., Doe v. United States*, 132 F.3d 1430, 1433–1434 (C.A.Fed.1997) (suit for backpay and correction of military records following administrative discharge); *Mitchell v. United States*, 930 F.2d 893, 896–897 (C.A.Fed.1991) (suit for backpay, reinstatement, and correction of records).  Or he may enter a district court under the "Little Tucker Act," 28 U.S.C. § 1346(a)(2).  See, *e.g., Thomas v. Cheney*, 925 F.2d 1407, 1411, 1416 (CA Fed.1991) (reviewing challenge to action to drop plaintiff from the rolls); *Sibley v. Ball*, 924 F.2d 25, 29 (CA1 1991) (transferring to Federal Circuit case for backpay because within purview of "Little Tucker Act").

*Id*. at 539–40 (footnotes omitted).  It would certainly appear that a claim quite like Col. Hanson's could be brought by, say, an Army officer through one of the Tucker Acts or through APA review of an ABCMR decision.

We note, by the way, that, contrary to the apparent view of the concurrence, a suit under the Tucker Act directly challenges the military discharge order; it is not simply judicial review of a BCMR decision.  In *Clinton* the Supreme Court stated that "a servicemember may enter the Court of Federal Claims with a challenge to dropping from the rolls (or other discharge) under the Tucker Act, 28 U.S.C. § 1491.  *See, e.g., Doe v. United States*, 132 F.3d 1430, 1433–34 [Fed. Cir. 1997]."  526 U.S. at 539 (footnote omitted).  In the case cited with approval, Major Doe had been discharged because of alleged sexual molestation of his daughter.  He unsuccessfully sought relief through military channels up to the Air

Force Board for Correction of Military Records (AFBCMR). He did not seek relief from the Board's action through the APA. Rather, he sued the United States under the Tucker Act. (Suits under the Tucker Act must be brought against the United States, so it is obvious why Doe did not name his commanding officer as a defendant; but the purpose and result of the suit are to countermand the dismissal order by the military command.) The Federal Circuit, after reviewing the evidence presented to the military Board of Inquiry, concluded that "the decision to discharge [Doe] is not supported by substantial evidence." *Id.* That review included no mention of the proceedings before the AFBCMR. *See id.* at 1434–37. The appellate court then "remanded [the case] to the [court of federal claims] to fashion an appropriate remedy, including both back pay and correction of records, *such as to restore Major Doe to the position he would have been in but for the wrongful discharge*." *Id.* at 1437 (emphasis added).

Nevertheless, we agree with Maj. Gen. Wyatt that the district court had no basis for granting the relief it did. Indeed, his argument is, at least in one sense, more powerful than that which prevailed in the cases he relies on. In those cases the plaintiff brought a recognized cause of action—such as under the FTCA, the *Bivens* doctrine, the ADEA, or Title VII—that on its face applied to the plaintiff's claim, but the court carved out an exception to the cause of action for military matters. Here, in contrast, neither Col. Hanson nor the district court invoked a

-11-

recognized cause of action (or argued for creation of a novel one) that on its face could support Col. Hanson's claim. (Of course, if such a cause of action had been identified, it would then be necessary to determine whether—for reasons such as those set forth in *Shearer*, *Stanley*, and *Costner*—Col. Hanson's claim should nevertheless be barred from proceeding. This opinion does not challenge the holdings in those cases.) We proceed to address the various possibilities.

To begin with, it is clear that Col. Hanson has not sought relief under either of the Tucker Acts. Claims under the Tucker Act, 28 U.S.C. § 1491, and the Little Tucker Act, *id*. § 1346(a)(2), must be brought against the United States. But Col. Hanson's complaint does not name the United States as a defendant or cite either Tucker Act. Nor was the United States served as required by Fed. R. Civ. P. 4(i).

With respect to the APA, the situation is a bit more complex. Col. Hanson's complaint invokes the APA as a basis for jurisdiction, asserts that he exhausted his administrative remedies, and seeks a "declaration that the ABCMR's decision was arbitrary, capricious, clearly erroneous, and not in accordance with law." J. App. at 14. Nevertheless, the present suit is not a proper one under the APA. Unless a statute specifically authorizes judicial review of agency action (which is not the case here), judicial review is limited to "final agency action," 5 U.S.C. § 704. An "agency" must be an "authority of the

-12-

Government of the United States." *Id.* § 551(1). Col. Hanson's suit, however, is not brought against a final action by a federal agency. Rather, as we shall see, it is brought against Mag. Gen. Wyatt in his state capacity.

One possible final agency action against Col. Hanson was the decision of the ABCMR rejecting his challenge to the SRB's recommendation. As the Supreme Court stated in *Clinton*, "A servicemember claiming something other than monetary relief may challenge a BCMR's decision to sustain a decision to drop him from the rolls (or otherwise dismissing him) as final agency action under the [APA]." 526 U.S. at 539. Col. Hanson's complaint actually seeks "a declaration that the ABCMR's decision denying relief to Hanson was arbitrary, capricious, clearly erroneous and not in accordance with law"; but review of an ABCMR decision under the APA should proceed as a suit against the Secretary of the Army. For "examples of such challenges," the *Clinton* Court cited opinions by a circuit court, *Roelofs*, 628 F.2d at 599–60, and a district court, *Walker*, 848 F. Supp. at 251, 254–55, in both of which the defendant was the Secretary of a branch of the armed forces. The D.C. Circuit wrote in *Roelofs* that the APA applies to the Air Force BMCR "through the Secretary of the Air Force." 628 F.2d at 599; *see* 32 C.F.R § 581.3(a); *Banks v. Commander of Detachment 1*, 797 F. Supp. 984, 987 (M.D. Ga. 1992) (APA challenge to ABCMR decision should be through action against Secretary of the Army). Not only is the Secretary of the

Army not a defendant in this case, but the United States was not even served, as required for any action against an agency or officer of the United States. *See* Fed. R. Civ. P. 4(i)(2). Such service is necessary so that the United States Attorney General can appear in the litigation to represent any federal interest at stake.

Perhaps one could also characterize as a final agency action the decision by Adjutant General Wyatt to accept the SRB recommendation. But the challenge to Maj. Gen. Wyatt's decision is not with respect to his federal capacity. Several considerations lead us to this conclusion. First, we can presume that Col. Hanson's highly competent counsel (now a district judge in this circuit) would have recognized that it was quite doubtful that he could have obtained an enforceable judgment against the adjutant general in his federal capacity without serving the United States. The failure to serve the United States was obviously because the complaint was not intended to seek relief from the United States or any federal agency.

Second, to the extent that Maj. Gen. Wyatt was acting in his federal capacity in deciding that the SRB had not violated NGR 635-102, that issue was reviewed by his superior in the command structure—the Secretary of the Army, acting through the ABCMR. *See* 32 C.F.R. § 581.3(a)(1) ("This section prescribes the policies and procedures for correction of military records by the Secretary of the Army, acting through the [ABCMR]."); *cf. Clinton*, 526 U.S. at

539 (BCMR decision is "final agency action"). Even though an agency decision can sometimes be final for purposes of the APA despite the failure to exhaust administrative remedies, *see Darby v. Cisneros*, 509 U.S. 137 (1993), once an otherwise final agency action (as Maj. Gen. Wyatt's decision may have been) is reviewed by a superior in the agency hierarchy, the standard practice (and our research has uncovered no counterexample) is that the APA claim is brought against the superior. For example, in *Bowman v. Astrue*, 511 F.3d 1270 (10th Cir. 2008), cited by the concurrence at page 19, the suit was not against the administrative law judge but against the Social Security Commissioner. We can assume that Col. Hanson would have followed this standard practice if his suit had been intended as one against Maj. Gen. Wyatt in his federal capacity.

Third, there was a quite sensible reason to sue Maj. Gen. Wyatt in his state capacity. In contrast to his authority in the federal hierarchy, Maj. Gen. Wyatt in his state capacity, as "executive and administrative head" of Oklahoma's military department, Okla. Stat. Ann. tit. 44, § 21, had the last word. Only the adjutant general could reinstate Col. Hanson in the Oklahoma National Guard. *See Penagaricano*, 747 F.2d at 57.[1]

---

[1]We note that in the record of proceedings of the ABCMR, Maj. Gen. Wyatt "advised that the non-selection action taken by the SRB only withdrew [Col. Hanson's] State appointment in the OKARNG [Oklahoma Army National Guard]," and Col. Hanson "still retains his Federal rank and status." J. App. at 21.

We are not saying that Maj. Gen. Wyatt acted solely as a state, not federal, authority in adopting the SRB's recommendation not to retain Col. Hanson. All we are saying is that the above considerations lead us to conclude that Col. Hanson is suing Maj. Gen. Wyatt only in his state capacity.[2]

A suit against Maj. Gen. Wyatt in his state capacity, however, cannot be brought under the APA. Maj. Gen. Wyatt, acting in his state capacity, is not an "authority of the Government of the United States," 5 U.S.C. § 551(1), and hence not an agency subject to suit under the APA. *See Gilliam v. Miller*, 973 F.2d 760, 763–64 (9th Cir. 1992) (adjutant general did not act in capacity of federal agency when removing plaintiffs from state national guard, so they were not entitled to review under APA). *Compare Knutson v. Wisconsin Air Nat'l Guard*, 995 F.2d 765, 767–78 (7th Cir. 1993) ("focus[ing] on the nature of [the] action and functional capacity of the actor," court holds that "state officers exercising their state authority to effectuate the termination of state militia personnel" acted under

---

[2]We emphasize that we are saying nothing about the scope of the ABCMR's authority in reviewing Maj. Gen. Wyatt's decision. Also, we are not addressing whether Col. Hanson has a claim under the APA against Maj. Gen. Wyatt in his federal capacity, because we believe that Col. Hanson's claim is against Maj. Gen. Wyatt in his state capacity. We note, however, that even if Col. Hanson's APA claim was against Maj. Gen. Wyatt in his federal capacity, we would need to reverse the judgment against him in that capacity because of the failure to serve the United States. *See Jordan v. United States*, 694 F.2d 833, 835 (D.C. Cir. 1982) ("It is indisputable that a valid judgment cannot be entered against the United States without proper service.").

color of state law and were therefore subject to suit under 42 U.S.C. § 1983) *with*

*Lipscomb v. FLRA*, 333 F.3d 611, 618 (5th Cir. 2003) (adjudant general was

federal agency with respect to his authority over federal employees).

The remaining statutes cited in Col. Hanson's complaint are (1) the

Declaratory Judgment Act, 28 U.S.C. § 2201, 2202, and (2) 28 U.S.C. § 1331.

But "[t]he [Declaratory Judgment] Act does not create substantive rights."

*Farmers Alliance Mut. Ins. Co. v. Jones*, 570 F.2d 1384, 1385 (10th Cir. 1978).

Nor does § 1331. *See W. Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1058

(10th Cir. 1993) (to bring case under § 1331, plaintiff must have cause of action

arising from a federal right).

To the extent that Col. Hanson may be suggesting that the alleged violation

of NGR 635-102 in itself gives him a cause of action, this theory also fails. The

Supreme Court has recently clarified that it will rarely recognize an implied

private cause of action arising from a mere regulation. In *Alexander v. Sandoval*,

532 U.S. 275 (2001), Sandoval had brought a class action that resulted in an

injunction against Alabama's Department of Public Safety for administering

driver's license examinations only in English, in violation of a Department of

Justice regulation authorized by § 602 of Title VI of the Civil Rights Act of 1964.

The Supreme Court had previously recognized an implied private cause of action

under § 601 of the Act, but the regulation at issue prohibited conduct permissible

under § 601, so the private right of action under § 601 was not available. *See id.* at 285. The Court held that Congress had not created a private right of action to enforce the regulation. The statute authorizing the regulation, § 602, contained no "rights-creating" language. *Id.* at 288 (internal quotation marks omitted). And it did not focus on the individuals protected. *See id.* at 289. "Nor [did] the methods that § 602 [provided] for enforcing its authorized regulations manifest an intent to create a private remedy." *Id.* On the contrary, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* at 290. Moreover, that the regulation itself contained rights-creating language could "not create a right that Congress has not." *Id.* at 291; *see* 13 Charles Alan Wright et al., Federal Practice and Procedure, §3531.6, at 1173 (2d ed. Supp. 2007) (suggesting that *Alexander* can be justified on the ground that private remedies for wrongs defined solely by regulation should be recognized only when Congress has clearly intended that result).

As we now show, *Alexander* does not permit an implied right of action under NGR 635-102. Mr. Hanson has not asserted the statutory basis for that regulation, but it appears to be 10 U.S.C. § 14704, which states:

> (a) Boards to recommend officers for removal from reserve active-status list.—Whenever the Secretary of the military department concerned determines that there are in any reserve

component[3] under the jurisdiction of the Secretary too many officers in any grade and competitive category who have at least 30 years of service computed under section 14706 of this title or at least 20 years of service computed under section 12732 of this title, the Secretary may convene a selection board under section 14101(b) of this title to consider all officers on that list who are in that grade and competitive category, and who have that amount of service, for the purpose of recommending officers by name for removal from the reserve active-status list, in the number specified by the Secretary by each grade and competitive category.

(b) Separation of officers selected.—In the case of an officer recommended for separation in the report of a board under subsection (a), the Secretary may separate the officer in accordance with section 14514 of this title.

(c) Regulations.—The Secretary of the military department concerned shall prescribe regulations for the administration of this section.

The statute does not contain rights-creating language. The focus of § 14704 is the authority of the Secretary, not the rights of officers subject to nonretention. Indeed, the statute makes no mention of any right or benefit of officers being considered, except that those not selected for retention may be separated under 10 U.S.C. § 14514 (which addresses transfer to the Retired Reserve). Although the statute contains no provision for enforcement of the regulations promulgated under its authority, we can presume that Congress was aware of potential remedies mentioned in *Clinton*—namely, review by a BMCR, possibly followed by court review under the APA, and review under the Tucker Act and Little

---

[3]The Army National Guard of the United States is a reserve component. *See* 10 U.S.C. § 10101(1).

-19-

Tucker Act, *see* 526 U.S. 538–40. In light of those remedies, there is no reason to posit "a congressional intent to create privately enforceable rights through [§ 14704] itself." *Alexander*, 532 U.S. at 290. As in *Alexander*, there is "no evidence anywhere in the text to suggest that Congress intended to create a private right to enforce regulations promulgated under [§ 14704]." *Id*. at 291.

Finally, we note that Col. Hanson alleges a violation of constitutional due process, and he may be contending that the district court could exercise authority to enjoin conduct that infringes constitutional rights. But we need not address the scope, or even existence, of such authority, because Col. Hanson's due-process claim is flawed on its face. The Fifth and Fourteenth Amendments to our Constitution forbid the deprivation of "life, liberty, or property, without due process of law." Col. Hanson, however, cannot point to any protected liberty or property interest of which he has been deprived. He does not claim a property interest in military office. *See Christoffersen*, 855 F.2d at 1443 (plaintiff had "no constitutionally protected property interest in continued employment with [state guard]"); *Penagaricano*, 747 F.2d at 62 (same); *McFarlane v. Grasso*, 696 F.2d 217, 222 (2d Cir. 1982) (same). The basis for his due-process claim is simply the failure of the SRB to comply with NGR 635-102 by conducting a review of his status. But "an entitlement to nothing but procedure cannot be the basis for a liberty or property interest" protected by the Due Process Clauses. *Stein v.*

*Disciplinary Bd.*, 520 F.3d 1183, 1192 (10th Cir. 2008) (brackets and internal quotation marks omitted).

**RESPONSE TO CONCURRENCE / JUSTICIABILITY**

Not long ago, the Supreme Court approvingly quoted the proposition that "'[j]urisdiction . . . is a word of many, too many meanings.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998), quoting *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996). Perhaps the same can be said of the word *justiciable*. Maj. Gen. Wyatt terms his argument against recognition of Col. Hanson's claim as a matter of justiciability. The position of the concurrence is that Col. Hanson's claim raises a political question, a matter committed by the Constitution to the political branches of government. We respectfully disagree. First, we question whether Maj. Gen. Wyatt's argument is properly termed as one addressing justiciability in the sense that the term is used in the context of the political-question doctrine. Second, to the extent that the argument can be considered to be a justiciability argument, it is a peculiar one because justiciability is determined simply by examining whether Congress has authorized the cause of action—the very analysis we have undertaken. Third, this opinion's approach is proper because the Supreme Court has indicated that a court has some discretion in deciding that a claim fails to state a cause of action before (and

without) deciding whether the claim is nonjusticiable as a political question, even though jurisdictional issues must be decided before addressing the merits.

To understand the meaning of the term *justiciable* in the context of the political-question doctrine, we begin with the leading case on that doctrine, *Baker v. Carr*, 369 U.S. 186 (1962), which held that courts could consider an equal-protection challenge to the apportionment of state legislatures. At the outset, we note that the Court distinguished jurisdiction from justiciability:

> The District Court was uncertain whether our cases withholding federal judicial relief rested upon a lack of federal jurisdiction or upon the inappropriateness of the subject matter for judicial consideration—what we have designated "nonjusticiability." The distinction between the two grounds is significant. In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not "arise under" the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III, § 2), or is not a "case or controversy" within the meaning of that section; or the cause is not one described by any jurisdictional statute. Our conclusion, see pp. 208–237, *infra*, that this cause presents no nonjusticiable "political question" settles the only possible doubt that it is a case or controversy. Under the present heading of "Jurisdiction of the Subject Matter" we hold only that the matter set forth in the complaint does arise under the Constitution and is within 28 U.S.C. § 1343.

*Id*. at 198–99. As suggested in this passage, jurisdiction and justiciability both arise out of Article III. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352

(2006). But, as we shall see, the Supreme Court does not treat them identically for all purposes.

Second, *Baker* sets forth the criteria for determining whether a case presents a political question. The Court observed:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217.

The concurrence relies on the first ground for deciding that an issue is a political question—"a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Id.* But the Supreme Court has never suggested that all matters military—or even military personnel matters, the subject of this case—are committed to the political branches of government to the exclusion of the judicial branch. As we shall see, at most it has said that courts lack power to take action that amounts to running the military and has adopted in essence a plain-statement rule, at least in some circumstances, that precludes judicial review of military matters without clear authority from Congress. The

Supreme Court decisions on tort claims involving military personnel raised under the FTCA or as a *Bivens* action make no mention of the political-question doctrine nor use the terms *justiciability* or *nonjusticiable*. *See*, *e.g.*, *Stanley*, 483 U.S. 669*; Chappell v. Wallace*, 462 U.S. 296 (1983). (Nor is there any use of any derivative of the word *justiciable* in our decision in *Costner*, 833 F.2d 905, which barred claims by a National Guardsman under the ADEA and Title VII.) On the contrary, they make clear that Congress could have authorized the lawsuits that the Court dismissed. In a military case under the FTCA, *United States v. Johnson*, 481 U.S. 681, 686 (1987), the Court wrote: "[A]s the Court noted in *Feres* [*v. United States*, 340 U.S. 135 (1950)], Congress 'possesses a ready remedy' to alter a misinterpretation of its intent. *Id*. at 138." *See also id.* at 692 (Scalia, J., dissenting) (stating, contrary to *Feres*, that Congress had not exempted servicemember claims from the FTCA). It is apparent that the Court was treating the issue before it as one of legislative intent, not constitutional limitation; the Court was simply unwilling to read the broad language of the FTCA to encompass the plaintiff's claim (thereby adopting the equivalent of a plain-statement rule). And in the most recent *Bivens* case in this context, the Court said that "*congressionally uninvited* intrusion into miliary affairs by the judiciary is inappropriate," *Stanley*, 483 U.S. at 683 (emphasis added), again indicating that granting a cause of action for suits arising from military matters is not barred by

the Constitution (as it would be if such matters were committed to the political branches for decision), but is a matter for Congress to decide. This is not to say that *Stanley*, *Chappell*, and similar Supreme Court decisions are irrelevant to a suit like Col. Hanson's. If he had pointed to a cause of action that on its face encompassed his claim, we would need to decide whether considerations that informed those decisions would also bar this claim. But we need not reach that issue.

The one Supreme Court decision cited by the concurrence that does address the political-question doctrine in the military context is readily distinguishable from our case. In *Gilligan v. Morgan*, 413 U.S. 1 (1973), Kent State University students sought declaratory and injunctive relief to prevent civil-rights violations by the Ohio National Guard like those that had allegedly occurred on campus in 1970. In holding the case to be nonjusticiable, the Supreme Court emphasized the extraordinary scope of the requested relief:

> [T]his is not a case in which damages are sought for injuries sustained during the tragic occurrence at Kent State. Nor is it an action *seeking a restraining order against some specified and imminently threatened unlawful action*. Rather, it is a broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard.

*Id.* at 5 (emphasis added). The opinion's next paragraph described that "broad call":

-25-

> Respondents continue to seek for the benefit of all Kent State students a judicial evaluation of the appropriateness of the "training, weaponry and orders" of the Ohio National Guard. They further demand . . . that the District Court establish standards for the training, kind of weapons and scope and kind of orders to control the actions of the National Guard. Respondents contend that thereafter the District Court must assume and exercise a continuing judicial surveillance over the Guard to assure compliance with whatever training and operations procedures may be approved by that court.

*Id*. at 5–6. The Court found the claim nonjusticiable because of a combination of several factors: "[t]he advisory nature of the judicial declaration sought," "the nature of the questions to be resolved [being] committed expressly to the political branches of government," "the uncertainty as to whether a live controversy still exists," and "the infirmity of the posture of respondents as to standing." *Id*. at 10. Notably, it did not suggest that these factors would be present in all disputes involving military affairs:

> It should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum *for violations of law or for specific unlawful conduct* by military personnel, whether by way of damages or injunctive relief. We hold only that no such questions are presented in this case.

*Id*. at 11–12 (emphasis added). (It is perhaps worth noting that the Supreme Court soon thereafter recognized a civil suit for damages arising out of the Kent State tragedy. *See Scheuer v. Rhodes*, 416 U.S. 232, 249 (1974)). *Gilligan* does not support the position that all cases involving military personnel decisions are nonjusticiable. Judicial resolution of a single personnel decision by interpreting a

promulgated regulation is a far cry from a court's "establish[ing] standards for the training, kind of weapons and scope and kind of orders to control the actions of the National Guard." *Gilligan*, 413 U.S. at 6.

Moreover, to read these decisions as foreclosing justiciability of military personnel decisions is contrary to a more recent Supreme Court decision. As previously discussed at some length, the Court in *Clinton*, 526 U.S. at 539–40, recognized judicial remedies under the APA and the Tucker Acts as "available to a servicemember demanding to be kept on the roles," *id.* at 537—the very demand of Col. Hanson.

This brings us to our second point. Perhaps what is meant by saying that Col. Hanson's claim is *nonjusticiable* is simply that the political branches of government have not authorized it. We question whether one could say that the Constitution commits an issue to the political branches, *see Baker*, 369 U.S. at 217, if the political branches can then convey to the judiciary the authority to resolve the issue. But if that is what is meant by justiciability in the circumstances of this case, then there can be no quarrel with the approach taken in this opinion. If a claim would be justiciable had Congress enacted legislation authorizing the claim, then a determination that Congress had not so authorized the claim would be essential to a determination that the claim is nonjusticiable. That is, the claim could not be determined to be nonjusticiable without examining

whether Congress had authorized such a claim. Thus, what we have done in this opinion—namely, determine that Congress has not authorized claims such as the one brought by Col. Hanson against Maj. Gen. Wyatt for alleged violation of a National Guard regulation—is something that must be done to resolve whether Col. Hanson's claim is justiciable (in the sense of the term used in this paragraph). The approach taken by this opinion would not be contrary to justiciability doctrine but simply an application of it. To be sure, if we lacked jurisdiction in this case because, for example, Col. Hanson lacked Article III standing, the claim was moot, or the question was not presented in an adversary context, then we would lack authority to decide whether Col. Hanson's claim stated a cause of action. But if justiciability turns on whether Congress has authorized a cause of action, then undoubtedly we are not precluded by nonjusticiability from deciding whether Congress has done so.[4]

The above discussion explains why justiciability doctrine does not preclude this opinion's treatment of Col. Hanson's claim based on a violation of NGR 635-

---

[4]The concurrence states that this opinion "say[s] that the courts have the authority to hear a case whenever the facts permit a plaintiff to state a claim for relief under a statute of general applicability." Op. (Gorsuch, J. concurring) at 21 n.12. This opinion, of course, says no such thing. As stated on page 11, *supra*, in the absence of an available statute of general applicability, we have no need to decide whether a claim like this could proceed if there were such a statute.

102.[5]  There remains, however, his due-process claim.  For reasons already expressed with respect to Col. Hanson's claim based on a violation of the National Guard regulation, we doubt that the claim is nonjusticiable under the political-question doctrine.  But regardless, we believe that it was appropriate for us to decide the matter on the merits without first addressing justiciability.

The concurrence cites various Supreme Court dicta from which one could reasonably infer that justiciability under the political-question doctrine must

[5]The concurrence claims support for its position on justiciability in a string cite of circuit-court opinions.  We have not ignored these cases.  Their reasoning has been ably captured in the concurrence's argument, which we have confronted. We would be more daunted by this authority if any of the opinions had distinguished the Supreme Court's decision in *Clinton*.  But none even cites *Clinton*, and only two were handed down after *Clinton*.  The most recent of the cited opinions is of particular interest in two respects.  In *Dibble v. Fenimore*, 339 F.3d 120, 126 (2d Cir. 2003), the court noted a circuit split regarding "the justiciability of claims [by servicemembers] who seek equitable relief for alleged constitutional violations in personnel decisions."  It counted five circuits that permit "equitable challenges to personnel decisions only when they constitute facial challenges to the constitutionality of military regulations, and not in cases of discrete individualized actions."  *Id.*  And it counted three that "have entertained equitable actions protesting military personnel decisions that were not facial challenges to the constitutionality of a military regulation."  *Id.*  Citing *Walden v. Bartlett*, 840 F.2d 771 (10th Cir. 1988), the court put this circuit in the minority camp.  Second, *Dibble* stated that "the rule of non-justiciability of discretionary military decisions is not absolute."  *Id.* at 128 (brackets and internal quotation marks omitted).  Perhaps anticipating suits like Col. Hanson's, the court gave an example of a justiciable claim:  "[W]here the military has failed to follow its own mandatory regulations in a manner substantially prejudicing a service member, we will entertain a suit seeking redress of the prejudice."  *Id.* (internal quotation marks omitted).  Because *Dibble* did "not allege that the Guard failed to follow its own procedures when it discharged him from service," the court held that he could not bring his claim.  *Id.*

always be addressed before the merits of a case. But contrary to that inference is the one Supreme Court holding directly in point, *New York v. United States*, 505 U.S. 144 (1992). New York contended, among other claims, that certain congressional legislation was prohibited by the Constitution's Guarantee Clause, which "guarantee[s] to every State in this Union a Republican Form of Government." U.S. Const. art. IV, § 4. The seminal Supreme Court decision under the political-question doctrine was a Guarantee Clause case, *Luther v. Borden*, 48 U.S. 1 (1849). And it has been said that "[v]iolation of the great guaranty of a republican form of government in States cannot be challenged in the courts." *Colegrove v. Green*, 328 U.S. 549, 556 (1946) (plurality opinion). The *New York* court, however, was not so sure about that. It decided not to resolve the matter on justiciability grounds. Rather, it *assumed justiciability* and rejected the claim on the merits. We quote at length:

> More recently, the Court has suggested that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions. Contemporary commentators have likewise suggested that courts should address the merits of such claims, at least in some circumstances.
>
> *We need not resolve this difficult question today. Even if we assume that petitioners' claim is justiciable, neither the monetary incentives provided by the Act nor the possibility that a State's waste producers may find themselves excluded from the disposal sites of another State can reasonably be said to deny any State a republican form of government.* As we have seen, these two incentives represent permissible conditional exercises of Congress' authority under the Spending and Commerce Clauses respectively, in forms that have

-30-

now grown commonplace.  Under each, Congress offers the States a legitimate choice rather than issuing an unavoidable command.  The States thereby retain the ability to set their legislative agendas; state government officials remain accountable to the local electorate.  The twin threats imposed by the first two challenged provisions of the Act—that New York may miss out on a share of federal spending or that those generating radioactive waste within New York may lose out-of-state disposal outlets—do not pose any realistic risk of altering the form or the method of functioning of New York's government.  *Thus even indulging the assumption that the Guarantee Clause provides a basis upon which a State or its subdivisions may sue to enjoin the enforcement of a federal statute, petitioners have not made out such a claim in these cases.*

*New York,* 505 U.S. at 185–86 (emphasis added, citations omitted).

We recognize that *New York* predates the Supreme Court's decision in *Steel*, which rejected the practice of hypothetical jurisdiction, a practice used by lower courts to reject a claim on the merits when that course was easier than deciding whether the court had jurisdiction.  *See* 523 U.S. at 102–03.  But *Steel* did not overrule *New York*.  Although *Steel* thoroughly canvassed Supreme Court decisions that might appear to have adopted hypothetical jurisdiction, it did not even *mention New York*.  This is particularly noteworthy because all five Justices who wrote (Justice Scalia) or joined the *Steel* opinion's discussion of hypothetical jurisdiction had joined (or, in the case of Justice O'Connor, written) the *New York* opinion less than six years earlier.  Perhaps this was just a remarkable lapse of memories; but we must assume that the Court has recognized a distinction between jurisdiction and political-question justiciability.  It may be worth noting

that neither *New York*'s treatment of the Guarantee Clause issue in that case nor our resolution of Col. Hanson's due-process claim is likely to raise any concern in the political branches about the courts' violating their turf.

In sum, we think that our opinion does not represent an improper exercise of judicial authority. Rather, we have addressed and resolved the core issue presented by the parties—whether the district court had authority to resolve Col. Hanson's claim against Maj. Gen. Wyatt based on a violation of a military regulation.

**CONCLUSION**

Col. Hanson has not stated a cause of action cognizable in federal court. We therefore REVERSE the judgment of the district court and REMAND to that court with instructions to dismiss the complaint. Because of this reversal, we need not address Col. Hanson's argument on cross-appeal that he is entitled to attorney fees.

06-6136, 06-6204, *Hanson v. Wyatt*

**GORSUCH, J.,** Circuit Judge, concurring in the judgment.


Like the court, I would reverse the district court's judgment with directions to dismiss this suit. Unlike the court, however, I would not reach the merits of Col. Hanson's claims. The court rests its decision on merits arguments never raised before the district court or briefed before us. When, at the end of its opinion, it turns to the justiciability question decided by the district court and contested by the parties in this appeal, the court holds that it has the power to entertain this case. While I fully agree with the court that "[j]usticiability is itself a concept of uncertain meaning and scope," *Flast v. Cohen*, 392 U.S. 83, 95 (1968), for several reasons I am unable to agree that the concept stretches so far as to permit us to hold justiciable suits, like this one, directly challenging a military discharge decision. First, the Supreme Court has repeatedly warned against congressionally uninvited judicial review in these very circumstances, holding that authority over discrete military personnel matters, including those involving federal oversight of the National Guard, is committed by the text of the Constitution to the elected branches. Second, this court has already ruled, in line with the Supreme Court's guidance, another service member's challenge to his discharge from the Oklahoma National Guard – a challenge materially identical to Col. Hanson's – to be nonjusticiable; respectfully, I believe we are bound to

follow our precedent on this score. Third, the overwhelming majority of our sister circuits, in line with the Supreme Court's guidance and our own governing precedent, have held suits like Col. Hanson's to be nonjusticiable; the majority today thus cements an inter- as well as intra-circuit split. Fourth, the majority's disposition of this case rests on novel merits grounds that invite significant future litigation in this area, a result the Supreme Court has expressly warned against. Fifth and finally, the court disposes of this case on bases that are open to serious question and does so without first affording the parties or district court a chance to be heard.

1. The Supreme Court has instructed that "[t]he complex subtle, and professional decisions as to the *composition*, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (first emphasis added). This rule reflects the fact that the Constitution explicitly confers upon Congress the power "[t]o make Rules for the Government and Regulation of the land and naval Forces," U.S. Const. art. I, § 8, cl. 14, and "[t]o provide for organizing, arming, and disciplining, the Militia [known now as the National Guard], and for governing such Part of them as may

be employed in the Service of the United States," *id*. at cl. 16.[1]  Such "a textually

demonstrable constitutional commitment of the issue to a coordinate political

department," *Baker v. Carr*, 369 U.S. 186, 217 (1962), triggers the applicability of

the political question doctrine, a component of Article III's "case or controversy"

requirement, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  And, of

course, "the presence of a political question suffices to prevent the power of the

federal judiciary from being invoked by the complaining party." *Schlesinger v.*

*Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974).

These guideposts strongly suggest the nonjusticiability of Col. Hanson's

suit.  Col. Hanson seeks to have the federal courts directly overrule his

commanding officer's "act of removing him from service under the authority of"

NGR 635-102.  Appellee's Br. at 3.  Citing both textual and prudential

---

[1]  To be sure, the Constitution affords the states with substantial shared authority over the militia.  *See* U.S. Const. Art. I, § 8, cl. 16.  But the suit before us challenges a decision made pursuant to a federal regulation to strip Col. Hanson of his federal recognition as a member of the National Guard, *see* NGR 635-102 ¶ 7 ("When the Federal recognition is withdrawn from officers under provisions of this regulation . . . ."), and this regulation is promulgated by a joint bureau of the federal Departments of the Army and Air Force pursuant to federal statutory authority, with review available before the federal Army Board for Correction of Military Records, *see* 10 U.S.C. § 1552.  For these reasons, we have consistently treated disputes like this one as implicating the federal authority to "organiz[e] . . . and disciplin[e] the Militia," *see Nelson v. Geringer*, 295 F.3d 1082, 1087, 1092 (10th Cir. 2002); *Costner v. Okla. Army Nat'l Guard*, 833 F.2d 905, 907 (10th Cir. 1987); *Lindenau v. Alexander*, 663 F.2d 68, 73 (10th Cir. 1981), as have many of our sister circuits, *see* Point 3 (collecting authority).

considerations, the Supreme Court has repeatedly declined to entertain suits like Col. Hanson's. In *Gilligan*, for example, a group of students at Kent State University sought an injunction to regulate certain aspects of the National Guard's personnel training procedures after some Guardsmen tragically shot and killed protestors on the University's campus. 413 U.S. at 3. The Sixth Circuit, like the panel today, expressed a willingness to reach the suit's merits. *Id*. at 4. The Supreme Court reversed, recognizing Congress's special authority over the military and National Guard, holding that "[i]t would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches" or "to conceive of an area of governmental activity in which the courts have less competence" than that involving "the composition . . . of a military force." *Id.* at 10.

To be sure, as the majority correctly points out, the Supreme Court has hardly suggested that all matters touching on military affairs are automatically beyond judicial competence. *See id*. at 11-12. The Supreme Court has held, for example, that judicial review of an administrative decision by the civilian Board of Correction of Military Records ("BCMR") not to correct a former service member's records is available pursuant to either the Administrative Procedure Act, the Tucker Act, or the Little Tucker Act. *Clinton v. Goldsmith*, 526 U.S. 529, 539 (1999). But in *Goldsmith* the Court also specifically declined to find jurisdiction

over a direct challenge to a discrete military discharge order, holding instead that the Court of Appeals for the Armed Forces exceeded its jurisdiction in enjoining the President and military officials from dropping plaintiff from the rolls of the Air Force. *Id*. at 531. The Supreme Court's analysis focused on the threshold issue whether Congress had, in the exercise of its textual authority to make rules governing the military, conferred on the courts jurisdiction to issue the relief requested. *Id*. at 533-34 ("When Congress exercised its power to govern and regulate the Armed Forces by establishing the [Court of Appeals for the Armed Forces] it confined the court's jurisdiction . . . .") (citation omitted). The line drawn by the Court in *Goldsmith* is precisely the same as the one Maj. Gen. Wyatt has advocated, and the one I would draw, in this case: a suit directly challenging a military officer's discrete federal discharge order is beyond the power of the federal courts to hear absent "Congress exercis[ing] its power to govern and regulate the Armed Forces" in a way that confers authority on the federal courts to hear the case, *id*. at 533; meanwhile, suits seeking review of a decision by a BCMR – a civilian administrative body Congress specifically created and authorized as a venue for service member grievances – may be reviewed under the APA standards applicable to other civilian administrative bodies. *See Kreis v. Sec'y of the Air Force*, 866 F.2d 1508 (D.C. Cir. 1989) (holding nonjusticiable claims for an injunction ordering retroactive promotion, but holding justiciable a

claim for review of the BCMR's decision respecting the correction of military records); *infra* Point 3 (citing additional authority drawing this same line). And there is no question on which side of the line Col. Hanson's claim falls: as the majority correctly notes, instead of bringing suit against the Secretary of the Army as required to seek relief from a BCMR decision, Col. Hanson seeks to inject the judiciary directly into his military chain of command by having the courts countermand Maj. Gen. Wyatt's order withdrawing his federal recognition as a member of the National Guard.[2]

By contrast, the standard for assessing the justiciability of military suits offered by the majority today – it would decline to hear only claims that require the judiciary to "run[] the military," Maj. Op. at 23 – seems to suggest that only military orders of a magnitude of Gen. Patton directing his troops across the Rhine are beyond the competence of the courts to adjudicate. As it happens, however, the Supreme Court has held that discrete personnel decisions like the one Col.

---

[2] NGR 635-102 provides procedures for the Selective Retention Boards ("SRBs") that review officers in the National Guard with more than 20 years of service. The regulation provides that the SRB make a recommendation to the Adjutant General, which he approves or disapproves within 30 days. Most pertinently here, NGR 635-102 provides that the Adjutant General may "[r]emove an officer's name from the nonselect list and place it on the select list for retention," NGR 635-102 § 5(j)(1)(b). What Col. Hanson sought and obtained from the district court was not a correction of any record that the ABCMR might supply, but an injunction ordering Maj. Gen Wyatt to select this specific action from among those available to him under the terms of NGR 635-102.

Hanson challenges are part and parcel of what it means to "run[] the military" and are themselves beyond judicial authority. So, in *Orloff v. Willoughby*, 345 U.S. 83 (1953), the Court refused to entertain the merits of a claim very much like Col. Hanson's – there, a military doctor's claim that his superiors denied him a commission as an officer on discriminatory grounds. The doctor asked the judiciary either to compel his commission (essentially the relief Col. Hanson seeks here) or to allow his discharge (the inverse of the relief Col. Hanson seeks). *Id*. at 87. Writing for the Court, Justice Jackson made plain that the judiciary has no business adjudicating such disputes:

> We know that from top to bottom of the Army the complaint is often made, and sometimes with justification, that there is discrimination, favoritism or other objectionable handling of men. *But judges are not given the task of running the Army.* The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President . . . . It is not difficult to see that the exercise of such jurisdiction as is here urged would be a disruptive force as to affairs peculiarly within the jurisdiction of the military authorities.

*Id*. at 93-95 (emphasis added).

Similarly, in *United States v. Shearer*, the Supreme Court held beyond the scope of judicial review the military's alleged negligence in failing to supervise more closely a potentially dangerous soldier. 473 U.S. 52, 57-59 (1985). In so doing, the Court rejected the plaintiff's attempts to avoid dismissal by characterizing her claim as a mere personnel dispute: "By whatever name it is

called, it is a decision of command." *Id.* at 59. Thus, while the majority appears to consider "running the military" to exclude decisions about who shall serve in the armed forces, in what manner, and at what rank, the Supreme Court has expressly and repeatedly decided otherwise. And the facts of this case go some way to illustrating why: we were informed at oral argument that, as a result of the district court's decision to overrule Maj. Gen. Wyatt's order approving the SRB recommendation to withdraw his federal recognition, Col. Hanson has been reinstated, and his unit was, at least at that time, slated for service in Iraq. This lawsuit thus quite literally seeks to compel a military commander, responsible for the well-being of troops who report to him, to accept an unwanted and potentially disgruntled officer back into his command structure immediately prior to deployment to a zone of armed conflict.

Finally, in *Chappell v. Wallace*, 462 U.S. 296 (1983) and *United States v. Stanley*, 483 U.S. 669 (1987), the Supreme Court, citing *Gilligan* and *Orloff*, held categorically out-of-bounds any damages actions involving any "injuries that arise out of or are in the course of activity incident to [military] service," not just those that might implicate high level military edicts. *Id.* at 684 (internal quotation omitted). Textually, the Court noted that the Constitution affords Congress "plenary control over rights, duties, and responsibilities" of the "military establishment." *Chappell*, 462 U.S. at 301; *see also Stanley*, 483 U.S. at 682.

Prudentially, the Court stressed that the "need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel[] would be undermined" by undue judicial intrusion. *Chappell*, 462 U.S. at 304. Perhaps most importantly, the Court rejected the argument that judicial review could be had where high level military decisions were seemingly not implicated by a particular suit, reasoning that "[a] test . . . that depends on the extent to which particular suits would call into question military discipline and decisionmaking would itself require judicial inquiry into, and hence intrusion upon, military matters." *Stanley*, 483 U.S. at 682.[3]

2. Not only does the court's course today swim upstream against a strong current of Supreme Court decisions, its way is blocked by our own precedent. We have already held nonjusticiable a suit materially identical to this one – involving

---

[3] While *Chappell* and *Stanley* did not expressly speak of their holdings in terms of justiciability, instead focusing on the proper scope of the judicially-created *Bivens* remedy that the plaintiffs in those cases sought, their reasoning falls squarely in line with the justiciability holdings of *Gilligan* and *Orloff*, and numerous of our sister circuits have interpreted *Chappell* and *Stanley* as defining the scope of justiciability in military affairs. *See, e.g.*, *Watson v. Ark. Nat'l Guard*, 886 F.2d 1004, 1005-11 (8th Cir. 1989); *Crawford v. Tex. Army Nat'l Guard*, 794 F.2d 1034, 1036-37 (5th Cir. 1986); *Speigner v. Alexander*, 248 F.3d 1292, 1296-98 (11th Cir. 2001); *Dibble v. Fenimore*, 339 F.3d 120, 125-28 (2d Cir. 2003); *Knutson v. Wisc. Air Nat'l Guard*, 995 F.2d 765, 770-71 (7th Cir. 1993). For commentary placing *Chappell* and *Stanley* in the political question tradition, see Stephen R. Brodsky, *Chappell v. Wallace*: A *Bivens* Answer to a Political Question, 35 Naval L. Rev. 1 (1986); Kevin M. Fillo, Comment, Intramilitary Tort Immunity: A Constitutional Justification, 15 Pepp. L. Rev. 623 (1988).

a challenge to a discharge ordered by the very same official now before us, the Adjutant General of the Oklahoma National Guard. *See Costner v. Okla. Army Nat'l Guard*, 833 F.2d 905, 907 (10th Cir. 1987). In *Costner*, the plaintiff claimed that he was wrongfully discharged in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. We declared that the adjutant general's dismissal was made in his "capacity as administrator for federal personnel," and proceeded to affirm the district court's judgment that the plaintiff's claims "were not appropriate for judicial review under the test applied in *Lindenau v. Alexander*, 663 F.2d 68 (10th Cir. 1981)." *Costner*, 833 F.2d at 907 (internal quotations omitted). Our decision rested on what we deemed the unwarranted degree of "interference in the military function that would result from sustaining plaintiff's challenge." *Id*. Specifically, we reasoned that inquiring into discharge and promotion decisions "would involve the court in a very sensitive area of military expertise and discretion." *Id*. at 908. Given *Costner*'s discussion of the appropriate limits of judicial review and explicit reliance on the test set forth in *Lindenau* for determining "whether there is a justiciable case" in suits challenging military decisions, *Lindenau*, 663 F.2d at 74, there can be no doubt that *Costner* was a justiciability holding and no doubt that the majority's holding that this case is justiciable directly contravenes *Costner*. Indeed, *Lindenau* itself, just as here,

involved the withdrawal of federal recognition from a member of the National Guard, and we cited both *Gilligan* and *Orloff* in support of our conclusion that the case was not susceptible to judicial review. *Id.* at 70-71.

3.  Interpreting the Supreme Court's guidance as I have, and consistent with our decision in *Costner*, the vast majority of circuits have held that, while judicial review may be had of congressionally authorized BCMRs, direct suits against military superiors challenging discharge and other discrete personnel decisions are not congressionally authorized and therefore would represent an inappropriate intrusion into matters textually and prudentially committed to the political branches.  They have frequently done so, moreover, in the very context here – suits brought by National Guard members challenging their dismissal by the relevant adjutant general.  *See, e.g., Watson v. Ark. Nat'l Guard*, 886 F.2d 1004, 1009 (8th Cir. 1989); *Crawford v. Tex. Army Nat'l Guard*, 794 F.2d 1034, 1036 (5th Cir. 1986); *Speigner v. Alexander*, 248 F.3d 1292, 1296-98 (11th Cir. 2001); *Kreis*, 866 F.2d at 1511; *Dibble v. Fenimore*, 339 F.3d 120, 127-28 (2d Cir. 2003); *Knutson v. Wisc. Air Nat'l Guard*, 995 F.2d 765, 770-71 (7th Cir. 1993); *Christoffersen v. Wash. State Air Nat'l Guard*, 855 F.2d 1437, 1440-45 (9th Cir. 1988); *Scott v. Rice*, 1993 WL 375664, at *2 (4th Cir. Sept. 23, 1993); *see also* E. Roy Hawkins, The Justiciability of Claims Brought by National Guardsmen Under the Civil Rights Statutes for Injuries Suffered in the Course of

Military Service, 125 Mil. L. Rev. 99, 128-32 (1989); Christopher G. Froelich, Comment, Closing the Equitable Loophole: Assessing the Supreme Court's Next Move Regarding the Availability of Equitable Relief for Military Plaintiffs, 35 Seton Hall L. Rev. 699 (2005). *But see Wigginton v. Centracchio*, 205 F.3d 504, 512-13 (1st Cir. 2000); *Jorden v. Nat'l Guard Bureau*, 799 F.2d 99, 109-11 (3d Cir. 1986).[4]  By holding Col. Hanson's claim justiciable and reaching its merits, the majority cements not only an intra- but also an inter-circuit split on a significant point of law and does so without affording the consideration due this substantial body of learning from our sister circuits.[5]

---

[4]  Neither *Dibble* nor *Walden v. Bartlett*, 840 F.2d 771 (10th Cir. 1988), are to the contrary. *See* Maj. Op. at 28 n.5. *Dibble* held suits seeking damages for discrete military personnel decisions to be nonjusticiable – the very sort of claims the majority holds permissible, *see* Maj. Op. at 8-11; *infra* at Point 4 – and none of the cases *Dibble* cites in support of the proposition that some military decisions are justiciable countenance direct review of discrete personnel orders. *See also infra* Point 4 (same problem in majority's discussion of *Doe*). *Walden*, meanwhile, involved a military prisoner seeking to bring something akin to a habeas corpus claim. It did not address the right of active military service members to litigate the personnel orders of their superiors. Meanwhile, *Costner* did address that question and answered it definitively. It is thus *Costner*, not *Walden*, that controls this case.

[5]  After holding this suit justiciable, the majority alternatively concludes, citing *New York v. United States*, 505 U.S. 144 (1992), that it may assume justiciability. Maj. Op. at 29-31. Respectfully, I cannot agree with this course. In numerous cases both before and after *New York*, the Supreme Court has held that justiciability is a threshold issue to be addressed before reaching the merits of a case. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *United States v. Sperry Corp.*, 493 U.S. 52, 66 (1989); *Nixon v. United States*, 506 U.S. 224, 226 (1993); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). Neither

(continued...)

4.   The Supreme Court has repeatedly instructed that "courts are ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have," *see Chappell*, 462 U.S. at 305 (quoting Earl Warren, The Bill of Rights and the Military, 37 N.Y.U. L. Rev. 181, 187 (1962)), and warned that the difficulty caused by direct judicial review of discrete military personnel matters is as much due to the mere *threat* of litigation as it is to *actual* litigation, s*ee id.* at 304 (expressing concern "with the disruption of the peculiar and special relationship of the soldier to his superiors that might result if the soldier were allowed to hale his superiors into court") (internal quotation omitted); *see also Stanley*, 483 U.S. at 682-83.  Despite these admonitions, the majority proceeds to the merits of Col. Hanson's suit, confident that its holding today will

---

[5](...continued)
did the Supreme Court assume justiciability in *Chappell* and *Stanley*, as the majority suggests.  *See* Maj. Op. at 24.  There, the Supreme Court engaged exclusively in what courts and commentators have agreed is a justiciability analysis, *see supra* n.3, and specifically rejected a merits inquiry akin to the majority's, stating that "it is irrelevant [to the justiciability analysis] whether the laws currently on the books afford [plaintiff], or any other particular serviceman, an 'adequate' federal remedy for his injuries," *Stanley*, 483 U.S. at 683.  Indeed, even on *New York*'s own terms, the present case would not be one where justiciability could be properly assumed.  Only in the presence of a "difficult" political question issue did the Supreme Court in *New York* assume the power to dispose of a fully briefed and straightforward merits question.  Here, by contrast, the political question the majority bypasses is one on which we have ample governing Supreme Court and circuit court precedent while the parties have never joined issue on the merits question the majority reaches and the resolution of that question is far from obvious.  *See infra* Points 4 & 5.

not impose any undue intrusion on military affairs. Yet, the contours of the majority's reasoning illustrate how, inadvertently to be sure, we may very well do just the opposite and, by this decision, open the door to future merits litigation by members of the military who wish to challenge their discharge or demotion. Consider the following holdings by way of example.

*First*, citing *Doe v. United States*, 132 F.3d 1430 (Fed. Cir. 1997), the majority states that "a suit under the Tucker Act directly challeng[ing] the military discharge order" may proceed. Maj. Op. at 10. Thus, under the majority's view, Col. Hanson's claim directly against Maj. Gen. Wyatt for reinstatement seemingly could have gone to trial if only he had cited the Tucker Act, an invitation to many future such suits to be sure. But a close review of *Doe* reveals that it offers little support for the majority's view. In *Doe*, the plaintiff brought suit against the United States after seeking and being denied BCMR review of his discharge. Unlike our suit, the plaintiff neither sued his commanding officer nor sought an injunction directly countermanding his commanding officer's orders. Rather, he simply sought review of "an administrative decision affecting military pay," *Doe*, 132 F.3d at 1434, and by way of relief sought only backpay and an order requiring the Secretary of the Air Force to correct his military records, *id*. at 1433, in effect

review of an adverse BCMR decision.[6]  *Doe* thus stands for the (uncontested) proposition that judicial review of BCMR decisions is generally appropriate; it does not countenance direct suits against military commanders seeking to overturn their discrete personnel orders, and the majority's contrary understanding is at odds with just *Doe* itself.  It is (again) also at odds with our own precedent barring as nonjusticiable parallel suits for damages brought under Title VII or the ADEA, *see Costner*, 833 F.2d 905, and the decisions of our sister circuits holding nonjusticiable damages suits under 42 U.S.C. § 1983, *see, e.g., Crawford*, 794 F.2d at 1035; *Knutson*, 995 F.2d at 767.  And the majority offers no reason to think damages actions under the Tucker Act brought directly against military superiors issuing discharge orders are any more appropriate for judicial resolution than those under Title VII, the ADEA, or Section 1983.

*Second*, the majority holds that Col. Hanson's suit under the APA fails because Col. Hanson chose to sue Maj. Gen. Wyatt exclusively in his state capacity.  Maj. Op. at 12-14.  The majority thus leaves open the possibility that a suit aimed at Maj. Gen. Wyatt in his federal capacity might succeed.  *See* Maj. Op. at 15 n.2 ("[W]e are not addressing whether Col. Hanson has a claim under the

---

[6] Specifically, Maj. Doe sought only "back pay from the date of his discharge through March 31, 1992, and retirement pay from April 1, 1992 . . . to the present.  Major Doe also sought to require the Secretary of the Air Force to correct his military records" to expunge an "Under Other Than Honorable Conditions discharge."  *Doe*, 132 F.3d at 1433.

-15-

APA against Maj. Gen. Wyatt in his federal capacity"). In doing so, the majority creates a roadmap for and invites substantial future litigation by service members who wish to air discharge or demotion grievances in federal court, creating precisely the sort of threat of litigation over military personnel matters the Supreme Court has instructed us to avoid.

In fact, it is not even clear why Col. Hanson's suit, fairly construed, fails on the majority's terms. The majority infers that Col. Hanson sued Maj. Gen. Wyatt exclusively in his state capacity only because the Colonel failed to serve the United States Attorney with process pursuant to Fed. R. Civ. P. 4(i). Respectfully, however, while failure to serve the United States properly can of course provide it with a good defense against the enforcement of any judgment, *see*, *e.g.*, *Oklahoma ex rel. Edmondson v. Pope*, 516 F.3d 1214, 1216 (10th Cir. 2008) (vacating judgment when the Attorney General of the United States was not properly served under Fed. R. Civ. P. 5 in a suit challenging the constitutionality of a federal statute), it tells us little about the claims contained in the plaintiff's complaint.

On that score, the record is plain. In Count Two of his Complaint, Col. Hanson seeks review under the APA, a statute that authorizes review only of federal agency action. Col. Hanson also seeks attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, a statute that allows litigants to recover attorney fees in certain suits against federal, not state, officials. And Col. Hanson

unmistakably describes his suit in federal terms.[7]  The majority thus asks us not to infer that Col. Hanson committed a service infraction under a relatively obscure rule applicable only in federal practice against the United States (an infraction that is both common and curable).  Rather, it asks us to make the much more tenuous inference that Col. Hanson and his able counsel deliberately undertook the (inexplicable) act of bringing a lawsuit against Maj. Gen. Wyatt exclusively in his state capacity while expressly seeking relief under federal statutes that pertain only to federal officials.  So while the majority lauds Col. Hanson's counsel, it concludes that he intentionally brought a suit that was an obvious loser.

The majority's inference about the nature of Col. Hanson's complaint becomes even more problematic when it concedes, as it must, Maj. Op. at 15, that when Maj. Gen. Wyatt discharged Col. Hanson, he acted in *both* a federal and state capacity.  An examination of NGR 635-102, the federal regulation pursuant to which Maj. Gen. Wyatt withdrew Col. Hanson's federal recognition, makes that point indisputable.  Although National Guard officers are appointed by the state in

---

[7] To pluck but one example:  "32 U.S.C. § 324 requires Adjutants General to supervise National Guard officers.  Appellant's wrongful application of a *federal* regulation resulted in Hanson's *federal recognition* in the Army National Guard being withdrawn.  Thus, Appellant's actions were taken in a federal capacity, involved the application of federal law, and impacted a federal status.  Thus, for purposes of the EAJA, the Adjutant General [is] subject to the assessment of attorney fees."  Appellee's Br. at 12 (emphases in the original) (citation omitted).

charge of their unit, they must also be federally recognized.  *See* 32 U.S.C. § 101(4); 32 U.S.C. § 305; *Nelson v. Geringer*, 295 F.3d 1082, 1088 (10th Cir. 2002); *see also supra* note 1.[8]  NGR 635-102 is the federal regulation, promulgated by federal authorities, that establishes the process by which National Guard officers' federal recognition is reviewed and, in Col. Hanson's case, withdrawn.  *See* NGR 635-102 ¶ 7 ("When the Federal recognition is withdrawn from officers under provisions of this regulation, they become members of the Army Reserve.").  Although the majority seems to suggest that Maj. Gen. Wyatt's acceptance of the SRB's recommendation resulted in Col. Hanson losing *only* his state recognition, Maj. Op. at 15 n.1 (stressing that Col. Hanson retains his "Federal rank and status"), that is simply incorrect.  It is not the case that *federal* Army National Guard regulation NGR 635-102 involves the review of a *state* appointment and that review of the decision to deny an individual that state appointment can be had from a purely *federal* agency, the ABCMR.[9]  As we

---

[8]  Commissioned officers in the National Guard of the United States are under dual state and federal control.  *Nelson*, 295 F.3d at 1088.  All officers are appointed by the state in charge of their unit, but the officers must also be federally recognized, which requires that they meet the qualifications established by the federal government.  32 U.S.C. § 307; *Nelson*, 295 F.3d at 1088.  "In other words, to be appointed an officer [in the National Guard], both the state and federal government must concur in the appointment; the requirements are prescribed, and must be verified, by the federal government, but the particular selection from among qualified applicants is reserved for the state."  *Id.*

[9]  While after his dismissal Col. Hanson may well have "retained his federal
(continued...)

-18-

expressly recognized in *Costner*, when the adjutant general makes a decision to withdraw federal recognition pursuant to federal regulation, he is acting as "agent of the United States in his capacity as administrator for federal personnel." 833 F.2d at 907. At the end of the day, then, the majority kills this suit only based on an unlikely construction of the plaintiff's complaint, one inconsistent with Col. Hanson's pleadings, the regulation at issue, and governing precedent, and though this particular suit is kept from moving forward, the next wave of plaintiffs invited by this decision can avoid the same fate simply by serving appropriate process.

*Third*, the majority stresses that Col. Hanson did not name the "Secretary of the Army, acting through the ABCMR," who is, according to the majority, the relevant final agency authority and thus the proper defendant in a suit under the APA. Maj. Op. at 14. The majority thus appears to conceive of the ABCMR as responsible for directly reviewing Maj. Gen. Wyatt's personnel order discharging Col. Hanson, rather than as a form of collateral review occurring after the fact. Although we are without the benefit of briefing from the parties or a decision by the district court on this subject, case law and the statutory and regulatory scheme

---

[9](...continued)
rank and status" for purposes of his status in the Army reserve, he was interested in more than federal rank and status – he wished to remain a recognized member of the National Guard, which requires membership in both the federal and state militias. It is for precisely this reason that he brought suit against Maj. Gen. Wyatt, an individual who controls the membership to both. *See Nelson*, 295 F.3d at 1088.

governing the ABCMR at least invite questions about that claim.[10]   And if the

majority does turn out to be wrong and Maj. Gen. Wyatt's order is "final" because

it was not reviewed or countermanded by a superior, *see, e.g.*, 5 U.S.C. § 704;

*Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008), the majority has opened

the courthouse doors to nearly any service member who may wish to air discharge

or demotion grievances in federal court.  Finally, even if the majority is correct

about the relationship between Maj. Gen. Wyatt and the ABCMR, no party before

us has contested the finality of Maj. Gen. Wyatt's order at any point during

proceedings in this case (which has progressed to summary judgment).  Thus,

---

[10]  For example, in *Goldsmith*, far from suggesting that the military personnel order at issue was itself directly reviewable in any way by a federal court, the Supreme Court held that the Court of Appeals for the Armed Forces lacked jurisdiction to directly issue the relief sought.  Instead, the Court suggested the plaintiff must first seek *administrative* relief from the civilian BCMR before going to court.  *Goldsmith*, 526 U.S. at 537-38; *see also Watson*, 886 F.2d at 1008 (distinguishing between seeking an administrative correction of military records from the ABCMR and seeking injunctive relief in the form of reinstatement from the court).  With respect to the statute authorizing creation of the BCMRs, it provides for review of a discharge for a "former member" of the armed services, and contemplates review up to fifteen years after the completion of the discharge, *see* 10 U.S.C. § 1553, again suggesting that the BCMR process is distinct from the process of discharge.  And lastly, Army Reg. 15-185, governing the ABCMR, specifically provides that "[s]oldiers need not submit applications *through their chain of command*."  Army Reg. 15-185 § 2.3 (emphasis added).  Of course, these authorities may not compel the conclusion that the administrative process of correcting records is a separate process from that which results in a discharge order.  But the fact that this issue has not been briefed should make us hesitant to imply a relationship between a uniformed officer's orders and a civilian agency's actions that may not exist – much less to do so without citation to any authority, as the majority does.  *See* Maj. Op. at 14.

-20-

construing Col. Hanson's suit as he himself did – as a suit against Maj. Gen. Wyatt

in his federal capacity acting pursuant to federal law to withdraw federal

recognition – any dispute on this score would seem long since waived under our

governing precedent.[11]   And based on the majority's holding that this case is

justiciable, apparently even Col. Hanson's suit should be entitled to proceed.  The

only basis the majority cites to avoid this result is Col. Hanson's failure to serve

process, but the failure to serve process is an easily curable defect, one that we

normally allow the plaintiff an opportunity to fix, and a mistake future plaintiffs

seeking review of military matters in this circuit will no doubt avoid.[12]

---

[11]  The Supreme Court long ago held that the APA is not an affirmative grant of subject matter jurisdiction. *Califano v. Sanders*, 430 U.S. 99, 105-107 (1977); *see also City of Albuquerque v. U.S. Dep't of the Interior*, 379 F.3d 901, 906 (10th Cir. 2004).  Rather, Section 702 is a waiver of sovereign immunity, *High Country Citizens Alliance v. Clarke*, 454 F.3d 1177, 1181 (10th Cir. 2006), but we have not treated Section 704 as a limit on that waiver, *see Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1233 & n.9 (10th Cir. 2005); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186-87 (D.C. Cir. 2006).  As such, it is unclear why our general rule that "a mandatory but nonjurisdictional limit . . . may be waived," *Bowles v. Russell*, 127 S. Ct. 2360, 2368 (2007); *see also John Doe, Inc. v. Drug Enforcement Admin.*, 484 F.3d 561, 565 (D.C. Cir. 2007), does not operate here to waive any defect in the finality of Maj. Gen. Wyatt's order.  To be clear, I am here merely suggesting an error in the majority's APA finality analysis taken on its own terms; I am not suggesting that the United States has forfeited any defense in the event that it was not properly served. *Cf. Oklahoma ex rel. Edmondson v. Pope*, 516 F.3d 1214, 1216 (10th Cir. 2008) (vacating judgment when the Attorney General of the United States was not properly served under Fed. R. Civ. P. 5 in a suit challenging the constitutionality of a federal statute).

[12]  The majority appears to suggest as an alternative holding that its analysis whether Col. Hanson has a viable cause of action doubles as an analysis of

(continued...)

5. So far, the parties and district court have only addressed the justiciability of this suit. They have never had the chance to be heard on any of the various merits arguments devised by the court today. As the foregoing questions about the majority's merits analysis underscore, reaching and disposing of the merits without the benefit of briefing and argument from counsel or a decision from the district court can be a tricky business. In our adversarial system, appellate courts depend in significant measure on the parties and district court to sharpen and test

---

[12](...continued)
whether his suit is justiciable. *See* Maj. Op. at 26-27; *see also id.* at 11. Of course, as the Supreme Court has acknowledged, Congress may exercise its constitutional authority over the Armed Forces or militia by affording courts jurisdiction to hear challenges to discrete federal military personnel decisions. *See Goldsmith*, 526 U.S. at 533. But saying that Congress may confer on the courts authority to hear a class of cases, but has not done so, is hardly the same thing as saying that courts have the authority to hear a case whenever the facts permit a plaintiff to state a claim for relief under a statute of general applicability, which is how the majority proceeds in its alternative holding. Under the latter view, the political question doctrine becomes superfluous; whether courts have the authority to hear a case simply turns on the merits determination whether the facts of the case establish a plaintiff's entitlement to the relief sought under a statute of general applicability. But a court's authority to hear a case does not turn on a plaintiff's entitlement to relief. *See, e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) (holding that the plaintiff had "vested . . . legal rights, which are protected by the laws of this country" but that the Court lacked the power to enforce them). In an inquiry into justiciability, in other words, it is immaterial whether or not Col. Hanson has adduced facts sufficient to state a claim for relief, under the APA or otherwise, and none of the questionable merits rulings the court issues today need be reached. No doubt future litigants will perceive the difference between the court's holding today that Col. Hanson's claim fails but others like it, with facts and pleadings slightly tweaked, may succeed.

arguments for their soundness and strength. Fairness also dictates that the parties should be heard by some court at some point on the merits of their claims before those merits are adjudged and final judgment decreed: ours is not a system of sentences first, verdicts afterwards.[13] If this case is truly justiciable, as the court concludes, then the appropriate resolution is not to proceed to devise and then decide for ourselves a raft of merits arguments without hearing from the parties, but to remand the matter to the district court so that the parties might have a chance to litigate them in the normal manner. *See United States v. Int'l Bus. Machs. Corp.*, 517 U.S. 843, 855 (1996) (when a party "cho[o]se[s] not to" pursue a legal theory potentially available to it on appeal, we generally take the position that it is "inappropriate . . . without the benefit of the parties' briefing" to pursue that theory in our opinions); *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1278 (10th Cir. 1994) (White, J., sitting by designation) (passing on arguments without the benefit of briefing and argument "run[s] the risk of an improvident or ill-advised opinion, given our dependence as an Article III court on the adversarial process for sharpening the issues for decision") (internal quotations omitted).

For the foregoing reasons, I regret that I am unable to join the court's opinion. Respectfully, I submit the judgment in this matter should be reversed

---

[13] Lewis Carroll, *Alice's Adventures in Wonderland and Through the Looking Glass* 115 (2000 ed.).

with instructions to the district court to dismiss it as nonjusticiable.